AMALGAMATED CLOTHING WORKERS OF AMERICA,
AFL-CIO, *v.* WONDERLAND SHOPPING
CENTER, INC.

1. INJUNCTION—DISTRIBUTION OF HANDBILLS—SHOPPING CENTER—
   EQUALLY DIVIDED COURT.
   Decree enjoining interference with distribution of handbills,
   promoting purchase of merchandise bearing union label, on
   entire property of shopping center is affirmed, where court is
   equally divided between reversal and affirmance of decree as
   modified to permit distribution of handbills on sidewalk adja-
   cent to front entrance of a particular store (PA 1961, No 236,
   § 230).

2. COSTS — INJUNCTION — DISTRIBUTION OF HANDBILLS — SHOPPING
   CENTER.
   No costs are allowed on appeal in suit to enjoin interference with
   distribution of handbills at shopping center, per BLACK,
   KAVANAGH, SOURIS, SMITH, and O'HARA, JJ.

Appeal from Wayne; Bohn (Theodore R.), J.
Submitted February 7, 1963. (Calendar No. 56,
Docket No. 49,813.) Decided July 17, 1963.

Bill by Amalgamated Clothing Workers of
America, AFL–CIO, against Wonderland Shopping
Center, Inc., a Michigan corporation, its officers and
owners, to enjoin interference with distribution of
handbills promoting purchasing of merchandise bear-
ing union label. Decree for plaintiff. Defendants
appeal. Affirmed under PA 1961, No 236, § 230
(assigned CL 1948, § 600.230 [Stat Ann 1962 Rev
§ 27A.230]).

REFERENCES FOR POINTS IN HEADNOTES
[1] 14 Am Jur, Courts § 81.
[2] 28 Am Jur, Injunctions §§ 299, 300.

*Zwerdling, Miller, Klimist & Maurer* (*A. L. Zwerdling,* of counsel), for plaintiff.

*Milton M. Maddin,* for defendants.

Carr, C. J. (*for reversal*). As appears from its amended bill of complaint in the case, filed January 18, 1962, plaintiff is an unincorporated association representing workers, among others, engaged in the manufacture and sale of men's clothing. It was alleged that it "has among its primary objectives promotion of purchase and sale of aforesaid articles of clothing which are entitled to display the union label owned by plaintiff." The corporate defendant is the operator of a shopping center in the city of Livonia, Wayne county, Michigan. In such center there are a number of stores operated under leases given by defendants who have alleged in their answer to the bill of complaint that the individual defendants in the case are the actual owners of the property and operate it as such. Between the leased stores and the public highway is a large parking area designed for use by patrons of said stores and others having business relations therewith. Within the shopping center are maintained malls by which access to the various places of business in the center can be reached.

Among the tenants in the shopping center is a corporation designated as "United Shirt Distributors, Inc." In connection with its promotional work, as set forth in its pleading, plaintiff sought, through a representative, a distribution of handbills adjacent to the entrance from the mall to said store. Attached to the bill of complaint was a handbill of the kind in question. It was printed in conspicuous type, and obviously designed to discourage the purchase of nonunion made clothing. Attention was directed to the claim that United Shirt Distributors, Inc., was

offering for sale clothing made by a manufacturing company employing other than union labor. The handbill urged refusal to purchase such clothing, and affirmatively sought the cooperation of prospective customers in demanding apparel bearing the Amalgamated Union label. Printed in large type were the inquiries: "Does your suit and shirt have a union label? If not, why not?" Printed in type of smaller size at the bottom of the handbill was a statement to the effect that it was not directed against employees of the store or the employees of another employer servicing the store.

An examination of the handbill in question indicates that the basic purpose thereof was to promote the sale of clothing bearing the union label, which plaintiff in its bill of complaint alleged that it owned, and, to the furtherance of such end, the prevention of the sale of wearing apparel not having such a label attached thereto. It is conceded that no labor dispute in the ordinary acceptance of the term is here involved. Plaintiff sought permission for the distribution of the handbills immediately outside the entrance to the United Shirt Distributors store, and on the mall designed for access to such place of business as well as to other stores in the shopping center. Such permission was refused, and thereupon plaintiff instituted the present suit seeking injunctive relief against interference in any way with the claimed right to conduct its promotional campaign in the manner indicated. In support of its position the constitutional guarantees with reference to freedom of speech are invoked.

It was the claim of defendants in the trial court that the shopping center was private property, and that the entrances to the building and the use of the passageways therein were not dedicated to the public for general use but were maintained for the purpose of allowing access to the places of business

of the various tenants within the shopping center, and for the accommodation of persons having or contemplating business therewith. Defendants further asserted that under the leases with said tenants they were obligated to protect the right of "quiet enjoyment" of the various places of business concerned, that interference in any form with the business of a tenant was prejudicial to the property rights of defendants, and that the asserted right of freedom of speech did not authorize plaintiff to conduct its promotional activities by the means and in the manner sought.

On application by the plaintiff the circuit judge granted a temporary injunction. Following the hearing the relief sought by plaintiff was granted. In the opinion filed emphasis was placed on the decision of the supreme court of the United States in *Marsh* v. *Alabama,* 326 US 501 (66 S Ct 276, 90 L ed 265), and the general conclusion was indicated that a distinction is to be drawn between a single store and a multiple shopping center, resting on the extent of the operation. The right of each storekeeper to prevent an unauthorized intrusion was recognized. It was held, however, that the property of defendants, because of its extent and purposes, had lost its identity as private property. Decree was entered in accordance with the opinion and defendants have appealed.

On the hearing of the case a representative of the plaintiff was called as a witness and testified that he had been employed for approximately 11 years in the label department and that his work involved the promoting of the union label. He stated further in his testimony that in such promotional work emphasis was placed on the purchase of clothing, and on various other merchandise as well, bearing the label. As a part of such procedure the public was urged to buy products with the label thereon, and to

refuse to buy articles of industry not produced by union labor. The witness further indicated that the particular handbill involved in the case was designed to further the purposes sought. He stated that he had surveyed the store of the United Shirt Distributors, Inc., and had determined as a result of such survey that clothing was being offered for sale therein that did not bear the Amalgamated label. The actual distribution of handbills was accomplished by a representative standing in proximity to the entrance to the store and passing out the printed exhibit to persons entering the place of business. It appears from the testimony of the witness in question that from $300,000 to $400,000 is expended annually throughout the country in the promotion of the union label and the sale of union-made goods.

Here, as in the circuit court, plaintiff relies on *Marsh* v. *Alabama, supra.* That decision involved a prosecution, brought under a State statute, for distributing religious literature on the premises of a suburb of Mobile, Alabama, known as Chickasaw. Said town was owned by the Gulf Shipbuilding Corporation. Property therein comprised residences, streets, a sewer system, a sewage disposal plant, and a so-called business block. It was emphasized in the majority opinion that, except as to ownership, Chickasaw had all the characteristics of an ordinary American town. The public generally used the company-owned streets and sidewalks, apparently without any question being raised as to the right to do so. The defendant in the case was convicted of a violation of the statute, the proofs indicating that, standing on a sidewalk near the post office maintained in the company town, she attempted to distribute literature of a religious nature. Appellant was advised that she could not distribute the literature without a permit being issued to her. She refused to desist from her venture and her arrest followed, the

resulting prosecution being under a provision of the State code declaring it to be a criminal offense to enter or remain on the premises of another after having been warned not to do so.

In reversing the conviction, such reversal being by a divided court, it was pointed out that under prior decisions neither a State nor a municipality could completely bar the distribution of religious or political literature on its streets, sidewalks, and public places, or make such right conditional on obtaining a permit. In reaching the conclusion indicated, it was said (pp 507–509) :

"We do not think it makes any significant constitutional difference as to the relationship between the rights of the owner and those of the public that here the State, instead of permitting the corporation to operate a highway, permitted it to use its property as a town, operate a 'business block' in the town and a street and sidewalk on that business block. *Cf. Barney* v. *Keokuk,* 94 US 324, 340 (24 L ed 224). Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free. As we have heretofore stated, the town of Chickasaw does not function differently from any other town. The 'business block' serves as the community shopping center and is freely accessible and open to the people in the area and those passing through. The managers appointed by the corporation cannot curtail the liberty of press and religion of these people consistently with the purposes of the constitutional guarantees, and a State statute, as the one here involved, which enforces such action by criminally punishing those who attempt to distribute religious literature clearly violates the First and Fourteenth Amendments to the Constitution.

"Many people in the United States live in company-owned towns. These people, just as residents

of municipalities, are free citizens of their State and country. Just as all other citizens they must make decisions which affect the welfare of community and nation. To act as good citizens they must be informed. In order to enable them to be properly informed their information must be uncensored. There is no more reason for depriving these people of the liberties guaranteed by the First and Fourteenth Amendments than there is for curtailing these freedoms with respect to any other citizen."

The factual situation involved in the case at bar is not analogous to that presented in *Marsh* v. *Alabama.* We are not concerned here with a company-owned town exercising and performing in practical effect the powers and functions of a municipal corporation. The defendant shopping center is not a town in any sense of the term. It performs no governmental functions so far as this record discloses. Its property, privately owned, is devoted to the carrying on of private businesses.

As before suggested, the means of access to such businesses as are conducted by the tenants therein have been provided for the use of those who desire for business reasons to visit the stores, shops, and other business places. In view of the apparent theory on which the decision of the majority of the court in *Marsh* was based, we are not in accord with the claim that the holding is controlling in the instant controversy. A like comment may be made with reference to *Tucker* v. *Texas*, 326 US 517 (66 S Ct 274, 90 L ed 274). It is significant to note that the dissenting opinion in *Tucker* was based on the theory that the record in the case showed a conviction for refusing to leave premises owned by the government of the United States and not shown to have been dedicated to general use by the public.

In *Martin* v. *City of Struthers*, 319 US 141 (63 S Ct 862, 87 L ed 1313), there was involved the valid-

ity of a municipal ordinance forbidding any person to ring doorbells or otherwise summon the occupants of any residence for the purpose of distributing handbills or circulars. The supreme court of the State of Ohio sustained the validity of the ordinance in a prosecution against one seeking to distribute literature of a religious nature, specifically leaflets advertising a religious meeting. In reversing the decision of the State court, it was said (pp 146–149) :

"Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved. The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas.

"Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off. General trespass after warning statutes exist in at least 20 States, while similar statutes of narrower scope are on the books of at least 12 States more. We know of no State which, as does the Struthers ordinance in effect, makes a person a criminal trespasser if he enters the property of another for an innocent purpose without an explicit command from the owners to stay away. The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed. This or any similar regulation leaves the decision as to whether distributors of literature may lawfully call at a home where it belongs—with the

home-owner himself. A city can punish those who call at a home in defiance of the previously expressed will of the occupant and, in addition, can by identification devices control the abuse of the privilege by criminals posing as canvassers. In any case, the problem must be worked out by each community for itself with due respect for the constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributers from the home."

The majority opinion in the above case was written by Justice Black, who also spoke for the majority in *Marsh* and *Tucker*. The suggestion that a property owner may protect himself from annoyance by suitable notice that he does not wish to be disturbed or have his property invaded is particularly significant. In the case at bar the representatives of plaintiff were specifically informed that the distribution of handbills in the manner intended was forbidden. The question presented is whether the constitutional right of freedom of speech and of the press applies to a situation of this character and overrides the rights of property owners, also constitutionally protected, to control the use of such property.

The cases above cited were followed by *Breard* v. *Alexandria,* 341 US 622 (71 S Ct 920, 95 L ed 1233, 35 ALR2d 335). The municipal ordinance under which the prosecution in that case was brought declared it to be a nuisance, and as such a misdemeanor, for solicitors or transient vendors of merchandise to enter in and upon private residences within the city, unless requested or invited by the owners or occupants thereof, for the purpose of soliciting orders for goods or for selling same. It appeared from the record in the case that the defendant and others whom he employed were engaged in the business of soliciting magazine subscriptions. The

validity of such ordinance was sustained by a decision of the majority of the court, which affirmed the action of the supreme court of Louisiana. The decisions in *Marsh* and *Tucker,* above cited, were referred to in the majority opinion but were declared to be not applicable. The conclusion expressed in the controlling opinion appears to be summarized by the closing statement therein, as follows (pp 644, 645):

"Subscriptions may be made by anyone interested in receiving the magazines without the annoyances of house-to-house canvassing. We think those communities that have found these methods of sale obnoxious may control them by ordinance. It would be, it seems to us, a misuse of the great guarantees of free speech and free press to use those guarantees to force a community to admit the solicitors of publications to the home premises of its residents. We see no abridgment of the principles of the First Amendment in this ordinance."

Prior decisions of the United States supreme court dealing with the question in issue here were discussed at some length in *Hall* v. *Commonwealth of Virginia,* 188 Va 72 (49 SE2d 369). Defendant in the case was prosecuted under a State statute declaring it to be a misdemeanor punishable by fine to go upon or remain upon the land or premises of another after having been forbidden to do so by the owner or other person lawfully in possession. The facts in the case indicated that the accused insisted on distributing religious literature in an apartment building occupied by between 200 and 300 persons and being 12 stories in height. Defendant Hall and others went into the building for the purpose of distributing religious tracts and to invite the occupants to attend a lecture scheduled to be delivered in a certain public park. Defendant was interrupted in his work and told to leave the building. Subse-

quently he again sought to distribute tracts and invitations to attend a public meeting, notwithstanding that he was denied the right to do so. The arrest and conviction followed. In upholding the conviction the Virginia court (p 77) cited with approval the statement of Mr. Justice Black in *Martin* v. *City of Struthers, supra,* that:

"Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off. General trespass after warning statutes exist in at least 20 States, while similar statutes of narrower scope are on the books of at least 12 States more."

The court further commented on the decisions in *Marsh* v. *Alabama* and *Tucker* v. *Texas, supra,* distinguishing them from the case under consideration on the basis of the facts involved.

In support of its conclusions the Virginia supreme court cited with approval the cases of *People* v. *Bohnke,* 287 NY 154 (38 NE2d 478), and *Watchtower Bible & Tract Society* v. *Metropolitan Life Ins. Co.,* 297 NY 339 (79 NE2d 433, 3 ALR2d 1423). In the latter case it appeared that the defendant insurance company owned in the borough of the Bronx, New York City, a residential community called "Parkchester" covering 129 acres and housing 12,000 family units. The buildings were from 7 to 12 stories in height. Two public highways ran through Parkchester, and there were numerous private streets, lanes, and parks, as well as shops, offices, and service stations operated by tenants. All of the apartments were occupied under leases from defendant. Regulations were prescribed with reference to the property, among which was a provision prohibiting canvassing, peddling and solicitation within the property without the consent of the manager of the development or the tenant of any apartment

notifying the manager that consent thereto was given. A religious group seeking to circulate its literature throughout the place was advised that approximately 30 of the tenants were willing to receive visitors distributing literature, but that the other tenants were not. Permission was given accordingly to visit such tenants as consented thereto, but was denied as to the other tenants. The religious sect in question sought to make the same use of the halls, elevators, and stairways, as had been attempted in the *Virginia Case,* and instituted a suit in equity for the purpose of obtaining an injunction against the Metropolitan Life Insurance Company from interfering in the contemplated door-to-door canvass within the apartment buildings. The relief sought was denied, and the regulations were declared valid. The New York court of appeals affirmed and in doing so rejected the claim of the plaintiff that the decisions in *Marsh* v. *Alabama* and *Tucker* v. *Texas, supra,* were controlling.

The decision of the supreme court of Illinois in *People* v. *Goduto,* 21 Ill 2d 605 (174 NE2d 385), decided April 26, 1961 (certiorari denied 368 US 927 [82 S Ct 361, 7 L ed 2d 190]), is also of interest in the consideration of the problem before us. In that case the defendants were tried and convicted under a statute declaring it to be an offense for anyone to enter upon the land of another and on being notified to depart therefrom by the owner or occupant refuse to comply. The defendants Goduto and Friedman were representatives of a labor union and entered upon the parking lot of Sears, Roebuck & Company for the purpose of distributing union leaflets and questionnaires to store employees. The superintendent of the store informed defendants that soliciting on the property without permission was not allowed, and requested that they leave. The defendants refused to do so, insisting that they had

a legal right to solicit on the property.   Their arrest and prosecution followed.

On behalf of defendants in said case it was urged on the appeal of their conviction that under the national labor relations act there was a right of solicitation by non-employee union organizers on company property, and that interference with such activity was prohibited "when it can be shown that there is no reasonable alternative channel of communication with the employees or where a valid no-solicitation rule is being unfairly applied."   In support of such statement the court (p 612) cited the decisions of the United States supreme court in *Republic Aviation Corp.* v. *National Labor Relations Board,* 324 US 793 (65 S Ct 982, 89 L ed 1372, 157 ALR 1081); *National Labor Relations Board* v. *Babcock & Wilcox Co.,* 351 US 105 (76 S Ct 679, 100 L ed 975); and *National Labor Relations Board* v. *United Steelworkers of America, CIO,* 357 US 357 (78 S Ct 1268, 2 L ed 2d 1383).   It appearing that no effort had been made by defendants or their union to invoke the jurisdiction of the national labor relations board, the court concluded that it had jurisdiction to pass on the application of the trespass statute that defendants were charged with having violated.   Apparently no claim was made that permission had been sought from Sears, Roebuck & Company to distribute union literature on the parking lot.   As in the case at bar, defendants, on appeal, relied on *Marsh* v. *Alabama, supra.*   With reference to the claim in this respect, the court said (pp 615, 616):

"Despite the fact that certain language in that opinion concerning the right to use private property for speech, press and assembly would appear to support defendants' contention when that language is not read in the light of the facts of the *Marsh Case,* we believe that the case 'goes no further than to say that the public has the same rights of discussion on

the sidewalks of company towns that it has on the sidewalks of municipalities.' (*National Labor Relations Board* v. *Stowe Spinning Co.*, 336 US 226, 242, [69 S Ct 541, 549, 93 L ed 638, 649] [dissenting opinion].) The present case does not involve a company town. It is recognized that freedom to solicit for union organization will, under certain circumstances, require an employer to allow the solicitor to approach employees on his property (*National Labor Relations Board* v. *Babcock & Wilcox Co.*, 351 US 105 [76 S Ct 679, 100 L ed 975]), but this freedom of solicitation is the result of a regulatory statute and not a constitutional right. See: *Republic Aviation Corp.* v. *National Labor Relations Board*, 324 US 793 (65 S Ct 982, 89 L ed 1372, 157 ALR 1081).

"We hold that freedom of speech and press guaranteed to defendants by the First and Fourteenth Amendments to the Federal Constitution and by section 4 of article 2 of our Constitution did not give them the right to remain on the parking lot after they were ordered to leave.

"It is also argued that the people failed to prove that Sears had the right to exclude defendants from the property. It is admitted that Sears is the lessee of the property; that the property is used as a parking lot for customers and employees; and that defendants were not employees or prospective customers but were on the parking lot for the sole purpose of distributing leaflets. We believe that this is a sufficient showing of Sears' right to demand that the defendants leave the premises.

"Defendants also argue that unlawful entry is the gist of the crime and that their entry upon the parking lot was lawful. They were not charged with, or convicted of, unlawfully entering upon the land of another but were charged with and found guilty of unlawfully remaining upon the land of another after they had been ordered to move. The statute declares such conduct to be a misdemeanor."

In the instant case plaintiff is seeking the aid of equity to enable it to send its representatives upon the property of defendants, and upon other properties of like nature, in connection with the promotional campaign in which it is engaged. The cases cited in support of its position do not support a conclusion that the property of defendants, the shopping center in question here, is so dedicated to use by the public generally as to vest in plaintiff, or others, the right to make use thereof in connection with the promotion of interests sought to be advanced.

That we have before us a test case is obvious. The basic question at issue is whether a right of the character asserted here on behalf of plaintiff, and which the Court is asked to uphold, is within the scope of constitutional guarantees relating to freedom of speech and of the press. There is much force in the argument of defendants that if plaintiff is entitled to enforce by judicial aid its alleged right, other members of the public may do likewise for the purpose of advancing their particular interests. Conceivably the manufacturer of merchandise in competition with articles offered for sale to the public in any store located in defendants' property might claim the privilege of distributing handbills, through its employees, urging members of the public entering the store to refrain from the purchase of specific articles therein and to purchase elsewhere instead the goods advertised in such manner. That any such procedure would constitute material interference with the business of the particular store involved is obvious. It is equally apparent that solicitors in various lines of work might stand without the entrance to a store in the furtherance of their particular businesses.

As before noted, means of access to the shopping center of the defendants were designed for the use of members of the public seeking for proper reasons

to enter a place of business therein. There is no general invitation because of the nature of the property for others to use the premises for business purposes of their own not connected in any way with the shopping center or its occupants. The carrying on or solicitation of business by other than the tenants in question is obviously not consistent with inherent property rights in the exercise of which defendants are entitled to be protected.

On behalf of plaintiff it is urged that distribution by a single representative in proximity to the entrance to the store of United Shirt Distributors, Inc., does not constitute a material interference with the carrying on of business in the center. However, if plaintiff has the right asserted by it, it is apparent that the means of exercising that right might be increased and extended and that, as before suggested, others might assert the same right. A condition might well be created highly prejudicial to the purposes for which the shopping center was established, and materially interfering with the rights of the defendants and their lessees.

No question of racial discrimination is involved in the controversy, as in several of the cases cited on behalf of plaintiff; nor do we have here a labor dispute of any kind or nature. Rather, the question at issue involves the promotion of business activities. Under the situation presented we are impressed that plaintiff is not invested with the right or privilege claimed by it, that it is not entitled to invoke the constitutional guarantees on which it relies, and that it is not entitled to the equitable relief sought in the present suit.

The decree of the circuit court should be reversed, and the bill of complaint dismissed. Defendants may have costs.

DETHMERS and KELLY, JJ., concurred with CARR, C. J.

BLACK AND SMITH, JJ. (*for modification and affirmance*). The case, critically examined, presents this decisively clean question: Whether an associational right to inform can be barred because the right is sought to be exercised on privately-owned property which for specific purposes has been dedicated by the freeholder to public use.

If the union were handbilling on public property it would seem there could be no question as to its right to there inform the public of a situation considered inimical to the interests of its members. Indeed, defendants by their brief tacitly concede that peaceable distribution of plaintiff's handbills, were such done on a public sidewalk of a public street as commonly known, would of right receive constitutional sanction.

We proceed, then, upon this premise, a premise we think is confirmed by the *Marsh Case;*[1] that if it were not for the fact that the store of United Shirt Distributors, Inc., abuts on 1 side of the sidewalks of this privately owned shopping center, we would be required to find that the right upheld below is guaranteed, not only by the First and Fourteenth Amendments, but also by our even more broadly worded State Constitution.[2]

This brings us to the reviewed ruling that the public nature of the mall, the sidewalks, the acres of

[1] *Marsh* v. *Alabama*, 326 US 501 (66 S Ct 276, 90 L ed 265).— REPORTER.

[2] "Sec. 4. Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of such right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." Const 1908, art 2, § 4.

Our new Constitution is yet more liberal:

"Sec. 5. Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press." Const 1963, art 1, § 5.

parking sections and the other lease-designated
"public areas" of Wonderland calls for application
of constitutional principles announced in the *Marsh
Case*. The findings:

"As noted, the defendant shopping center is lo-
cated in the city of Livonia. It is a large shopping
center, approximately 4 blocks square, consisting of
55 acres. Defendants lease to over 60 different
tenants including a large store operated by Mont-
gomery Ward & Co. A parking lot is maintained to
park approximately 5,500 American-made auto-
mobiles. Joint advertising media are sponsored by
the defendant for its lessees. On occasion it has
estimated that over 60,000 people from Livonia and
adjacent areas have visited the shopping center in
a single day. Defendants, in order to attract trade,
spend considerable money and effort in promoting
the idea of the public coming onto the property and
utilizing it. They have attempted to make it a com-
munity shopping area. * * *

"The facts in the case herein presented are similar
to those in the *Marsh Case, supra*. The law con-
tained therein is controlling. The defendants oper-
ate a shopping area which, although privately owned,
is quasi-public, in nature. The very character of
the large shopping center lends itself, essentially, to
a public function. The area is 55 acres in size, and
cuts off public streets that would normally be avail-
able for public use. There isn't anything to prevent
people from driving through from one side of the
shopping center to another. The shopping center
is accessible and freely open to the public. Members
of the public can either come in to shop, or merely
walk around. No one requires a person to make a
purchase. Every effort is made by the defendants
to promote the center as a community center. The
handbilling was carried on in what was described
in the lease to the tenant as a public area.

"The change from the operation of a single store
by a storekeeper to a large, complex, multiple

shopping center, alters the very nature of the operation from one of a purely private character to one of public or quasi-public character. The single storekeeper would still be entitled to prevent any unauthorized intrusion on his private property. The defendants, through this large development, in a highly urban area, no longer can claim the same rights to their property. The property of the defendants has lost its identity as private property."

The crux of the *Marsh Case* is that the company-owned town of Chickasaw, because of the extent and purpose of its invited and accepted public use, lost its original identity as wholly private property. As the Court pointed out in *Marsh* at page 508, "The 'business block' serves as the community shopping center and is freely accessible and open to the people in the area and those passing through." The Court said further, at page 507: "Whether a corporation or municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free."

*First:* Simply as an augmentive attestant of due applicability of the *Marsh Case,* we hold without hesitation that the corporate defendant has, by the very necessities and profitable advantages of its invitational and fully effective plan of doing business, made a special dedication, to general public use during regular shopping hours, of its self-designated "public area of the shopping center."[3]   Such dedication is not of statutory nature. It arises from and

3 Section 3 (VII) of the lease to United Shirt Distributors characterizes and designates the walkways in question by a special covenant reading:

"Tenant agrees to pay upon demand, in addition to the rental set forth in article 3 of this lease, a proportionate share of the cost of operating, lighting, cleaning, snow removal, line painting, policing and maintenance, [et cetera] * * * of all the public area of the shopping center. Tenant further agrees to pay a proportionate share of the cost of operating, lighting, cleaning, snow removal, line painting, policing and landscaping of the public areas."

is implied by operation of the common law, and will endure by the common law so long as the purposes of the center and Wonderland's present conduct of business thereon is continued. As said in the *Marsh Case* at 506, the more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights as owner become circumscribed. To say thus is no more than utterance of that principle of the common law by which the dedication of property to specific public use is implied from the owner's act or actions and public acceptance thereof.

That Alabama decided, in the *Marsh Case*,[4] that by her law and the disclosed distinctive facts there had been no dedication of the sidewalk where the appellant was arrested, does not control our independent application to the current facts of a rule written long ago; a rule which applies to the unreserving action of the corporate defendant in setting up Wonderland and to the public acceptance of that defendant's invitation to park and shop at Wonderland with the convenience which motor shopping more and more urgently requires.

So far as reasonably industrious research discloses, the subject of common-law dedication and of rules determinative thereof arose first in the United States when *City of Cincinnati* v. *Lessee of White,* 31 US (6 Pet) 431 (8 L ed 452), and *New Orleans* v. *United States,* 35 US (10 Pet) 662 (9 L ed 573), came to judicial consideration. The principles found there and echoed later in *Baker* v. *Johnston,* 21 Mich 319,[5] and *Badeaux* v. *Ryerson,* 213 Mich 642, may be summarized properly as follows:

---

[4] *Marsh* v. *State,* 32 Ala App 24 (21 S2d 558); certiorari denied 246 Ala 539 (21 S2d 564).

[5] "We think it must be assumed as the generally understood law at this day, and as law here, that there may be a dedication effectual against the land owner, without a statutory and formal conveyance to the county." *Baker* v. *Johnston* at 344.

Private property may, by unceremonious act and implication from act on the part of the landowner, and like act and implication from act on the part of the public, become subject to public easement by means of common-law dedication. The public right in such instance does not depend upon acceptance and use for any particular period of years. The fact of dedication and acceptance, and the extent of the dedicated use, must be determined from the intent of the dedicators and acceptors and the legal significations thereof. No particular form is necessary to such dedication. The fee does not pass. An easement does. There may be a public abandonment after acceptance, and reversion to the original owner, when the use for which the dedication was made becomes impossible of execution or where the object of the use fails. As said generally in *New Orleans* v. *United States, supra* at 712, 713:

"That property may be dedicated to public use, is a well established principle of the common law. It is founded in public convenience, and has been sanctioned by the experience of ages. Indeed, without such a principle, it would be difficult, if not impracticable, for society in a state of advanced civilization, to enjoy those advantages which belong to its condition, and which are essential to its accommodation.

"The importance of this principle may not always be appreciated, but we are in a great degree dependent on it for our highways, the streets of our cities and towns, and the grounds appropriated as places of amusement or of public business, which are found in all our towns, and especially in our populous cities.

"It is not essential that this right of use should be vested in a corporate body; it may exist in the public, and have no other limitation than the wants of the community at large.";

and later with greater detail when the *Badeaux Case, supra,* was decided (p 647):

"If the premises of plaintiffs' counsel were to be conceded, and if it were to be held that the title, or a fee of any kind in the land, passed by the dedication, then the conclusion reached by counsel would be warranted by the authorities cited. But it is very clear to us that the dedication here was what is termed a common-law dedication; and we agree with counsel for plaintiffs in the force of the numerous citations from 18 Corpus Juris under the title of 'Dedication'; that dedication may be distinguished from a grant, and that there need be no grantee *in esse* at the time of the dedication, to give it effect; that no particular form or ceremony is necessary to the validity of a common-law dedication; that while ordinarily some written instrument is required to transmit a right of real property, the law applicable to dedication is different, and no writing or conveyance is necessary to render a dedication effective; and that dedications have been established in every conceivable way by which the intention of the dedicator could be evinced. But we think it is equally well established by the authorities that by a common-law dedication the fee does not pass, but only an easement."

The nature of the public right of use, promenade and concourse, in and about the "public areas" of a modern shopping center which has been set up and made attractively business-operable as here, is not particularly difficult of ascertainment and identity; there being no pertinently appreciable difference between these shopping centers and the historic public markets of earlier days. Wonderland is simply a modern public marketplace. Any handbiller, political leafleteer, ticket seller, hawker or speechmaker, utilizing the public walkways and malls thereof and being otherwise peaceable and law-abiding, can no more be indicted and tried as a trespasser, by and

at will of the holder of the naked fee of the place, than could his possibly more boisterous counterpart of yesteryear. One can imagine, for instance, what would happen should this corporate defendant exclude from the mall one of the mayor's (or governor's) literature-distributors prior to election day, or some hard working Old Newsboys and Goodfellows just before Christmas.

The only difference between the public market of earlier generations and the shopping center of today is that the same operation is now more "modern." The motor car and motor truck have replaced the buggy and dray and the sellers are fewer as they take in more cash. The purpose, though, and that is what counts as sellers display and exhort and buyers discuss and select, is "as old as civilization."[6] The public outdoor walkways and malls are equally as public during business hours regardless of whether the fee rests with a public or private freeholder.

*Second:* Consideration of the inferences that are legally as well as permissibly derivable from Wonderland's enterprise suggests it is not without significance that, when Wonderland's planners conceived and made publicly operable this Chickasaw-like "business block," the constitutional precedent of the *Marsh Case* was knowledgeably before them.

---

[6] "Markets are as old as civilization, and public market places have in many countries been identified with the most important events in their history. The purpose of markets has always been to secure to all persons the privileges and conveniences arising from a general concourse of buyers and sellers." CAMPBELL, J., writing for the Court in *Attorney General* v. *Detroit*, 71 Mich 92, 100, 101.

See Catlin's picturesque description of Detroit's first public market-place, at the foot of Woodward avenue between Jefferson and the Detroit River ("The Story of Detroit," p 214; published 1923 by the Detroit News). True, the then "renters of stalls" are now the lessee storekeepers, and the parking lot has replaced the hitching rail. There is 1 big difference, of course. The "public whipping post" at one end of the market building (same page; illustrated opposite page), for "dead-beats, petty thieves, disorderly persons, wife-beaters, habitual brawlers and other minor offenders," is no more.

And nowhere in the briefs, or in the record made below, has suggestion been made that the corporate defendant or any lessee thereof tried (prior to public acceptance in any conceivable way, if there was such way) to reserve the presently claimed right to brand as *trespassers* some comers to the "public area" whenever the ideas such *trespassers* desired to communicate might be deemed distasteful to some and inimical to the business of others. If this appeal should be upheld, the handbiller upon such "public area" (not the premises of "householders" as in *Martin* v. *City of Struthers,* 319 US 141 [63 S Ct 862, 87 L ed 1313], or the premises of "private residences" as in *Breard* v. *Alexandria,* 341 US 622 [71 S Ct 920, 95 L ed 1233, 35 ALR2d 335]) is to be made a *trespasser* if his handbill is undesirable; undesirable not by law but by the arbitrary decision of the property owner who, for business purposes, has made of his freehold a much greater public "business block" than that considered in *Marsh.* The law of policed admission or exclusion is hence to be made by the owner's caprice; the owner who by the opinion of the Chief Justice would be left free to decide whether this or that exercise of constitutional rights is to be permitted on the sidewalks of his "public area."

The rule of whimsical trespass defendants would have us declare and apply is more than portentous. If by the device of private ownership a "business block" of 55 acres may lawfully be set up to selectively exclude the right of free speech on the public malls and sidewalks thereof, then why may not a 550-acre company-community be set up[7] and made

---

[7] With saloons and dancehalls, diners and restaurants, ice cream sociables and temperance meetings, theaters and night clubs, ballparks and golf courses, churches and Sunday schools, carnivals and tent shows, garages and stores, motels and boarding houses and, perchance, a school and college; all, of course, for acceptable and respectable conformists.

profitably operable with like right of discriminatory exclusion from the public areas of undesirable free speechers? Yes, indeed, let the privately owned shopping center of today expand to the privately owned community of tomorrow; the community where the lordship of freehold may determine, free from judicial intervention, what upon that freehold one may say or publish, what persons are deemed trespassers thereon and what ones are not, how generally one must act and how he must not until he departs therefrom; with all such determinations freed from constitutional inquiry on ground that the scene of offense or "trespass" is private property.

The Chief Justice has written, and we agree, that a test case is before us; a case which demonstrates again that the struggle for maintenance of constitutional rights will not end as new means and methods of commerce, business, transportation, communication, recreation and social life unfold as they have and will during this second half of the twentieth century.

*Third:* It is best that we consider and decide what is *not* involved, and what we are *not* determining, on *de novo* consideration of this appeal to equity.

The parties agree that no labor dispute or controversy arising under Federal or State statute, and no involvement of Federal or State decisions construing or applying any such statute, is before us.[8] The decree below so recites, and that portion of the decree is not opposed.

Plaintiff does not seek the right to distribute handbills anywhere in the building or buildings of the

---

[8] Defendant-appellants' brief:
"None of the defendants nor the shopping center nor the shopping center tenants nor the United Shirt Distributors, Inc., have any labor contract or labor relations with the plaintiff, nor is there any labor controversy involved in this litigation."
Plaintiff-appellee's brief:
"There is no labor dispute involved between the parties."

corporate defendant or in "the passageways therein." It seeks only to distribute handbills—"beside the front entrance of the United Shirt Store"—inoffensively and without disturbance on the sidewalk of the mall which the corporate defendant has provided for public shopping; the place, we repeat, the corporate defendant has designated as part of "the public area of the shopping center."

Excepting by the indirection of diverting customers to other stores in search for union-made goods, plaintiff by such handbilling would sell no goods, and certainly by no stretch of wordplay would it sell or attempt to sell competitive goods in the Wonderland Center. Rather, by selling or "educating" Wonderland shoppers to a fact as well as an idea conveyed by its handbill, plaintiff would discourage the purchase at 1 of the Wonderland stores of goods "nonunion made." Its purpose is informative and negative, albeit odious and repulsive depending on point of view. It constitutes no promotion on Wonderland's sidewalk of a competitive business.

Parenthetically, and since there seems to be an irresolvable conflict amongst our membership respecting the legal brand this Court should place upon the primary aim and purpose of plaintiff's handbill, the undersigned deem it advisable that a copy of such handbill appear of record. It appears at the margin. We find from it that such aim and purpose is to inform that "Imperial Clothing," sold by the United Shirt lessee, is "nonunion made." Others here view such aim and purpose as "the promotion of business activities." The handbill, made thus visible in our reports, speaks our side of the judicial debate.

The appealed decree, too broad now as to injunctive scope,[9] should be restricted to permit only what

---

[9] The decree as it stands permanently restrains and enjoins the defendant "from in any way interfering with, or threatening to

# ATTENTION SHOPPERS ONLY!

## Don't Undermine Your Hard Won Standard of Living

**DO NOT BUY NON-UNION MADE**

*Imperial* **CLOTHING,** BEARING THIS LABEL

**Made by Sewell at United Shirt Distributors** ➡

UNITED
*Imperial* CLOTHES
*EXCLUSIVELY WITH*
UNITED SHIRT DIST.

Non-Union clothing is made under sub-standard working conditions
Non-Union standards are below union standards.

YOU — The Consumer do not benefit! The non-union manufacturer does not pass along his savings to you. He keeps them. Only the store and manufacturer can gain from the sale of non-union clothing.

American workers, our government and the public have fought hard for decent wages and working conditions. As a result America has the highest standard of living in the world.

*Protect Your Own Standard of Living!*
*Don't Turn the Clock Back 50 Years!*
DON'T GIVE YOUR HARD EARNED
DOLLARS TO NON-UNION
MANUFACTURERS

**Demand the Amalgamated Union Label** when you buy men's and boys' apparel

*YOUR ASSURANCE OF BEST IN BEST VALUE*

**DO NOT BUY NON-UNION MADE**

*Imperial* **CLOTHING,** BEARING THIS LABEL ➡

**Made by Sewell at United Shirt Distributors**

UNITED
*Imperial* CLOTHES
*EXCLUSIVELY WITH*
UNITED SHIRT DIST.

 

## DOES YOUR SUIT AND SHIRT HAVE A UNION LABEL?

# IF NOT, WHY NOT?

Amalgamated Clothing Workers of America, AFL-CIO

**This is not directed at the employees of this store or the employees of any other employer servicing this store.**

plaintiff has actually sought by its definitely exclusive proof, that is, the judicially protected right to distribute its handbills on the sidewalk adjacent to the front entrance of the United Shirt store. Such modification would effectively forestall dolefully

interfere with, handbilling and distribution of leaflets or handbills by plaintiff, its agents or representatives, on or about the premises of aforesaid Wonderland Shopping Center, Inc."

declared extensions of the effect of the decree as precedent. At the same time, it would make clear for all to see that this Court has confined the scope of such handbilling to the "public area" adjacent to such front entrance.

Modified thus, we would affirm the circuit court's decree without an award of costs.

Kavanagh and Souris, JJ., concurred with Black and Smith, JJ.

O'Hara, J. (for reversal). I concur in the result reached by the Chief Justice but I am impelled to write separately for the reason that I bottom my holding solely and exclusively on the proposition that the right of free speech is not here involved.

Freedom of speech is a constitutional safeguard against the growth of tyranny which has historically followed the suppression of the right to speak out on all subjects of man's intellectual inquiry. Secured earlier it would have protected Galileo against ecclesiastical tyranny, Voltaire from governmental tyranny. It permitted Robert Ingersol to stand on the public platform and invite the God he professed not to believe in to strike him dead. It secured to organized labor the right to publicize the existence of controversy between employer and employee by peaceful picketing. Its absence doomed Socrates to the hemlock and Copernicus to the posthumous publication of his astronomical observations. But the advocacy of buying 1 brand of shirt over another does not come within the orbit of freedom of speech. This is what the handbill reproduced in the joint opinion of Justices Black and Smith does. Demand, it says, this label in your clothing and don't buy clothing carrying that one. If this be an exercise of free speech, will equity be called upon to decree to American motor car manufacturers the "associa-

tional right to inform" by handbilling customers and potential customers of retail dealers advising them that they should not buy foreign made automobiles? Will equitable aid be lent to domestic watchmakers in their competitive endeavors with their Swiss counterparts and permit "handbilling" of retail jewelers to their detriment?

The confusion of the right of free speech and competition between sponsors of 1 or another of competitive commodities was dealt with by Chief Justice Rosenberry speaking for a unanimous Wisconsin supreme court (*Jelke, post*). In that case a State agency—a fair marketing commission—had issued to the press the following statement:

"This commission has a list of every merchant in the State that sold oleomargarine last year. It will secure a list of every merchant proposing to sell oleomargarine in the future, and every farmer in Wisconsin will be notified through the press as to what merchants have a sufficient interest in the welfare of the farmer to refrain from selling oleomargarine in competition with butter   *   *   *   so that the farmers may know who their friends are."

The oleomargarine industry obtained an injunction (*Jelke,* p 654) restraining the "circulating *   *   *   lists of the various dealers in oleomargarine, with the purpose of intimidating dealers therein *or endeavoring to hamper the distribution and/or sale of oleomargarine.*" (Emphasis supplied.)

The commission in its answer alleged that restraining of the circulation of the information was a denial of the right of free speech. The court held:

"It is claimed and strenuously argued here that the injunction constitutes an impairment of the defendant's right of free speech. This argument proceeds upon the theory that the right of free speech, for some reason not defined, rests upon a different

basis than other rights guaranteed to the citizen by the Constitution. While the right of free speech may in popular estimation be accorded a higher rank than other rights guaranteed to the citizen by the Constitution, in a legal and constitutional sense the right of free speech is of no greater dignity than the right to life, liberty, property, trial by jury, freedom of conscience, and other rights guaranteed to the citizen by the Constitution. Whether or not a particular act constitutes an exercise of the right guaranteed by the Constitution is, and under our system must always remain, a judicial question. It must be conceded that there may be limitations upon the right to speak. *State, ex rel. Olson,* v. *Guilford,* 174 Minn 457 (219 NW 770, 58 ALR 607 at p 612 *et seq.*), and cases cited; *Near* v. *Minnesota, ex rel. Olson,* 283 US 697 (51 S Ct 625, 75 L ed 1357); *Gitlow* v. *New York,* 268 US 652 (45 S Ct 625, 69 L ed 1138).

"In *Northern Wis. Co-op Tobacco Pool* v. *Bekkedal,* 182 Wis 571 (197 NW 936) the defendants were enjoined from 'interfering in any manner with the contracts of plaintiff.' This included solicitation by the defendant of the members of the plaintiff pool to breach their contracts with the pool. This was a clear restraint upon the right to speak, but it did not occur to counsel on either side, to the trial court, or to this court that such restraint was a wrongful invasion of the right of free speech. One may not, under the cover of free speech, wrongfully do injury to the business of another." *John F. Jelke Co.* v. *Beck,* 208 Wis 650, 666, 667 (242 NW 576*).

There as here the proponent of 1 commodity, the product of an important segment of Wisconsin's economy, the dairy farmer sought to hamper the sale of a competitive manufactured product. Here an important segment of our economy, a labor union, seeks to hamper the sale of a competitively manufactured product. My sympathies in this battle may

---

* Reported in NW as *John F. Jelke Co.* v. *Hill.*—REPORTER.

well reside with those who have gained for organized
labor its long overdue and well deserved economic
gains, but I cannot in judicial conscience align equity
with either competitor under the theory of the
abridgment of freedom of speech.

I agree with the disposition of the case by the
Chief Justice, but I agree with Justices BLACK and
SMITH that no costs should be taxed.