WOODLAND v MICHIGAN CITIZENS LOBBY

EQUITABLE LIFE ASSURANCE SOCIETY v MICHIGAN CITIZENS LOBBY

EQUITABLE LIFE ASSURANCE SOCIETY v FLINT TOWNSHIP POLICE DEPARTMENT

Docket Nos. 72625, 72332, 72333. Argued January 9, 1985 (Calendar Nos. 10, 11).—Decided November 13, 1985. Rehearings denied 424 Mich 1204.

> Woodland, an owner of a shopping mall, brought an action in the Kent Circuit Court against the Michigan Citizens Lobby, seeking a temporary restraining order, a preliminary injunction, and a permanent injunction to prevent the defendant from soliciting shoppers and gathering signatures on initiative petitions on the plaintiff's premises. The court, George R. Cook, J., so enjoined the defendants. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and GREEN, J. (HOOD, J., dissenting), affirmed (Docket No. 64388). The defendant appeals.

> Equitable Life Assurance Society of the United States and others brought an action in the Genesee Circuit Court against the Michigan Citizens Lobby and others, seeking preliminary and permanent injunctions to prevent the defendants from entering various malls owned by the plaintiffs for the purpose of engaging in noncommercial activities of any nature or, in the alternative, a declaration that its policy of limiting noncommercial activity in the malls was a reasonable time, place, and manner restriction with which the defendants must comply. The defendants counterclaimed, seeking similar relief to prevent the plaintiffs from interfering with their rights with respect to gathering signatures on initiative petitions. The court, Robert M. Ransom, J., granted the defendants partial summary judg-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] Am Jur 2d, Constitutional Law §§ 496 *et seq.*

> Validity, under state constitution, of private shopping center's prohibition or regulation of political, social, or religious expression or activity. 38 ALR4th 1219.

[3-5] Am Jur 2d, Initiative and Referendum §§ 2 *et seq.*

> See the annotations in the ALR3d/4th Quick Index under topic Initiative, Referendum, and Recall.

ment, holding that a right of access in the common areas of a large private shopping mall can exist for the purpose of soliciting signatures on an initiative proposal where the activity comports with the public nature of the property and does not unreasonably impair the value or use of the property as a shopping center. Equitable Life and others brought a related action in the Genesee Circuit Court against the Flint Township Police Department, the Genesee County Prosecutor, and the Genesee County Sheriff's Department, seeking damages and mandamus to compel the defendants to arrest and remove persons entering plaintiffs' property. The court, Robert M. Ransom, J., consolidated the case with Equitable's action against the Citizens Lobby and held that a result in the mandamus action was dependent upon the resolution of that case. The Court of Appeals, SHEPHERD, P.J., and BRONSON and BEASLEY, JJ., granted the plaintiffs leave to appeal (Docket Nos. 72064, 72065), and the Supreme Court granted the plaintiffs leave to appeal prior to decision by the Court of Appeals.

In an opinion by Justice RILEY, joined by Justices RYAN, BRICKLEY, and BOYLE, the Supreme Court *held:*

The provisions of the Declaration of Rights of the Michigan Constitution which guarantee the rights of free expression, assembly, and petition, the rights of initiative and referendum, and the right to amend the constitution, do not prohibit the owners of large privately owned malls from denying or restricting access to private individuals seeking to exercise these rights.

1. A state may, through the valid exercise of its police power, adopt reasonable restrictions on the use of private property. While a state, through its constitution, may afford greater protections than the federal constitution, the reach of individual rights afforded by the Michigan Constitution generally is limited to protection against government rather than against private parties. In light of traditionally accepted notions of the limited reach of constitutionally guaranteed individual rights, the past decisions of the Court, the documented history of the constitutional convention, and the underlying rationale of the state action limitation, it may not be presumed that the guarantees of the rights of free expression, assembly, and petition were intended to apply against private individuals or entities. If any presumption is to be raised, it is the contrary: unless otherwise expressed, constitutionally guaranteed protections are applicable only against the government.

2. Nor was regulation of the conduct or property of private parties intended by the adoption of the guarantees of the rights

of initiative, with respect to legislation, or to amend the constitution. The initiative provision is not expressed in terms of an individual right, but is reserved to the people collectively, and serves as an express limitation on the power of the Legislature. But the reservation of legislative authority does not make the people a part of the government. The provision does not protect an individual's right to gather signatures or proscribe conduct of private entities; nor does it implicitly confer a right of access to private property to gather signatures over the objection of the owner. Rather, the reservation of power is constitutionally protected from government infringement once invoked: once petition requirements have been met, the state may not refuse to act.

3. Property does not lose its private character merely because the public is generally invited to use it for designated purposes. Nor is size alone the controlling factor. The essentially private character of property does not change by virtue of being a large shopping center. No legal basis has been discerned to distinguish the shopping malls in these cases from other places where large numbers of people congregate, and thereby afford superior opportunities for political activities. Adaption of the federal public function doctrine to the shopping centers in these cases would provide a limited exception to the state action requirement rather than a complete dispensation of it and would simply treat the shopping centers as if they were the state for purposes of the state constitution's free speech and petition provisions.

Justice LEVIN concurred separately in the result.

*Woodland,* affirmed.

*Equitable Life,* reversed.

Chief Justice WILLIAMS, joined by Justice CAVANAGH, dissenting, stated that initiative activity may be pursued in the common areas of large, privately owned shopping malls, subject to reasonable time, place, and manner restrictions. The minimal intrusion on the rights of mall owners is justified in view of the importance of the power of initiative reserved to the people.

1. The Michigan Constitution provides that the power to propose, enact, and reject laws—the initiative—is reserved to the people. The power of initiative removes from the Legislature the exclusive right to make laws and leaves it a coordinate legislative body with the people. The role created for the people by the initiative power is closely akin to that of a fourth branch of government. The initiative process is not a right

against government, but is a declaration by the people that they are part of the legislative process. Essential to the exercise of the initiative power is access to people. To invoke the initiative, petitions must be circulated and signatures gathered in numbers sufficiently large to secure the amount required by the constitution. Major regional shopping malls such as the plaintiffs' provide a unique opportunity for the gathering of such signatures.

2. An essential element of the right against being deprived of property without just compensation and due process is the right to exclude others. Historically, however, property rights have been limited. The voluntary opening of mall property to use by the general public diminishes an owner's right to exclude, although it does not extinguish the right. In these cases, the owners' ability to adopt reasonable restrictions as to the time, place, and manner of initiative activity would result in only minimal intrusion on their property rights. Such intrusion is justified in view of the importance of the power of initiative.

3. In *Woodland,* the mall owners' policy of complete exclusion of initiative activity is clearly violative of Const 1963, art 2, § 9, requiring reversal of the judgment of the Court of Appeals, vacation of the trial court's injunction, and remand for further proceedings. In *Equitable Life,* the failure of the trial court to rule whether the mall owners' limited allowance of initiative activities was a reasonable time, place, and manner restriction requires remand for such a determination.

128 Mich App 649; 341 NW2d 174 (1983) affirmed.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — DECLARATION OF RIGHTS — PRIVATE PARTIES.

The guarantees of the rights of free expression, assembly, and petition, the rights of initiative and referendum, and the right to amend the constitution do not prohibit the owners of large privately owned malls from denying or restricting access to private individuals seeking to exercise these rights (Const 1963, art 1, §§ 3, 5, art 2, § 9, art 12, § 2).

2. CONSTITUTIONAL LAW — DECLARATION OF RIGHTS — PRIVATE PARTIES.

Constitutional guarantees of the rights of free expression, assembly, and petition were not intended to apply against private entities; rather, the protections are applicable against the government (Const 1963, art 1, §§ 3, 5).

3. Constitutional Law — Declaration of Rights — Private Parties.

The rights of initiative and to amend the constitution are not expressed in terms of individual rights, but are reserved to the people collectively and serve as an express limitation on the power of the Legislature; constitutional protection of the rights is afforded against government infringement once invoked (Const 1963, art 2, § 9, art 12, § 2).

Dissenting Opinion by Williams, C.J.

4. Constitutional Law — Initiative — Shopping Malls.

Initiative activity may be pursued in the common areas of large, privately owned shopping malls, subject to reasonable time, place, and manner restrictions; the minimal intrusion on the rights of mall owners is justified in view of the importance of the power of initiative reserved to the people (Const 1963, art 2, § 9).

5. Constitutional Law — Initiative.

The power of initiative removes from the Legislature the exclusive right to make laws and leaves it a coordinate legislative body with the people; the initiative process is not a right against government, but is a declaration by the people that they are part of the legislative process (Const 1963, art 2, § 9).

*Miro, Miro & Weiner P.C.* (by *Joseph Aviv*), for plaintiff Woodland.

*Miller, Canfield, Paddock & Stone* (by *Gregory L. Curtner* and *Gerald E. Rosen*), for plaintiffs Equitable Life Assurance Society and TCC Center Companies, Inc.

*Peter Linzer,* Cooperating Attorney for American Civil Liberties Union Fund of Michigan (*Robert Jerome Glennon* and *Ann L. Nowak,* of counsel), for defendants Michigan Citizens Lobby, et al.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Michael J. Moquin,* Assistant Attorney General, for the Attorney General.

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C.* (by *Theodore Sachs, Mary Ellen Gurewitz,* and *Mark Brewer*), for Local 876, United Food & Commercial Workers International Union, AFL-CIO, CLC and Michigan State AFL-CIO.

RILEY, J. In each of these cases the Michigan Citizens Lobby sought to engage in the solicitation of signatures for an initiative petition in the mall areas of privately owned shopping centers, over the objection of their owners, claiming that the denial or restriction of this activity is violative of the Michigan Constitution.

The issue presented is whether the Michigan Constitution's Declaration of Rights provisions which guarantee the rights of free expression, assembly, and petition, art 1, §§ 3, 5, and the powers of initiative with respect to legislation, art 2, § 9, and to amend the constitution, art 12, § 2, prohibit the owners of large private malls from denying or restricting access to private individuals seeking to exercise these rights. We hold that they do not.

## *Woodland v Michigan Citizens Lobby*

Woodland, a Michigan copartnership, is the owner and operator of Woodland Mall, a retail shopping center located in Kentwood, near Grand Rapids in Paris Township, Michigan. Woodland Mall consists of a wholly enclosed mall, three department stores, and a surrounding parking area. The enclosed mall of the shopping center is comprised of approximately eighty stores leased to individual tenants as well as common areas through which shoppers travel from store to store. The common areas are designed and maintained to

facilitate travel within the mall and to accommodate shoppers by providing numerous seating facilities, art works, and fountains. Woodland Mall maintains a strict written trespass policy prohibiting any activity in the shopping center that is not directly related to the enhancement of commercial retail sales, which the tenants and merchants rely upon and expect Woodland to enforce,[1] including soliciting, petitioning, securing signatures, speech making, distributing handbills, and similar activity.

The Michigan Citizens Lobby is a nonprofit Michigan corporation which advocates consumer interests. In March of 1982, the Citizens Lobby was seeking to qualify a petition to initiate state legislation and to qualify the proposal for the November 1982 ballot.[2]

On April 1, 1982, the director of the Citizens Lobby notified the management of Woodland Mall that members of the Michigan Citizens Lobby would gather signatures at the mall on April 3, 1982.[3] The mall informed him of its policy against such activity, but, on April 3, the director and other members of the Citizens Lobby entered the Woodland Mall to solicit signatures for the initiative petition. They were met at the entrance by a security guard who told them that they were not

[1] The tenants and merchants pay for maintenance of the common areas. None of the tenants and merchants of Woodland Mall may solicit business or distribute handbills or other advertising matter in the common areas.

[2] The Citizens Lobby was seeking to qualify a petition initiating legislation that would forbid the automatic pass-through of utility rate increases and require prior Public Service Commission approval of rate adjustments. The Citizens Lobby was successful in collecting the nearly 230,000 valid signatures necessary to qualify the proposal.

[3] Prior to April 1, 1982, representatives of the Citizens Lobby were informed that Woodland Mall had a strict policy against any expressive activity, and that no petition-gathering would be permitted at the mall, in response to an inquiry by the Citizens Lobby in March of 1982.

permitted to enter the shopping center for soliciting purposes. They were also met by the center manager who denied them access to the mall for their intended activities. Nevertheless, the Citizens Lobby entered the mall and set up three card tables, and signs announcing their presence and purpose, in the center of the mall, and began soliciting signatures. The mall manager informed them that they were on private property and asked them to leave. They refused to leave, and members of the Citizens Lobby continued soliciting signatures until 6:00 P.M. and announced that they would return on April 9 and 10 and thereafter for the same purpose.

On April 6, 1982, Woodland filed a verified complaint against the Michigan Citizens Lobby in the Kent Circuit Court, seeking a temporary restraining order, a preliminary injunction, and a permanent injunction, to prevent the Michigan Citizens Lobby from soliciting shoppers, gathering signatures, or otherwise entering and remaining on the Woodland Mall premises in violation of mall policy. The trial judge issued an ex parte restraining order on that same day. Following a hearing at which oral arguments were heard, the trial judge, on April 15, 1982, issued a preliminary injunction against the Michigan Citizens Lobby which was made permanent, by stipulation and agreement of the parties, on April 27, 1982. In relevant part, the order and final judgment read:

> [T]he defendant, Michigan Citizans [sic] Lobby, [is] permanently enjoined from any time soliciting shoppers, gathering signatures, distributing handbills or other literature, securing signatures on petitions, making speeches, and engaging in any other expressive activity on any of the property owned by the plaintiff, Woodland, a Michigan co-partnership, including the common areas, court-

yards, and corridors of Woodland Mall, a retail shopping center located in the Township of Paris, County of Kent, and State of Michigan.

The Michigan Citizens Lobby appealed, and the Court of Appeals affirmed the trial court's order. 128 Mich App 649; 341 NW2d 174 (1983).

*Equitable Life Assurance v Michigan Citizens Lobby*

Equitable Life is the owner of the Genesee Valley Center located in Flint Township, Michigan.[4] The Genesee Valley Center is an enclosed mall consisting of three department stores and approximately ninety-two smaller stores. Like Woodland Mall, the Genesee Valley Center has common areas which are designed to facilitate travel within the complex as well as to promote rest and relaxation. The area is kept aesthetically pleasing to encourage such activity. Equitable Life maintains a strict policy regulating and restricting noncommercial activity on its premises.[5]

---

[4] Equitable Life also owns four other shopping facilities in southeastern Michigan: Eastland Center in Harper Woods, Westland Shopping Center in Westland, Northland Center in Southfield, and Southfield Shopping Center in Taylor.

Factually, the confrontation here centers on Equitable Life's Genesee Valley Center. Equitable Life sought relief from the Michigan Citizens Lobby's activities with respect to its "properties," and the Michigan Citizens Lobby sought affirmative relief in its counterclaim with respect to all five shopping centers, specifically naming each.

From the record, it appears that there was ongoing litigation involving at least one of the other Equitable Life properties, between the same parties, in Wayne County. Both parties expressed a desire for the Genesee circuit judge to assume sole and total jurisdiction with respect to all five of Equitable Life's properties. It seems that the Wayne circuit judge and the trial judge here were amenable to such an arrangement. The record does not reflect any further action in this regard, except that the Genesee circuit judge's order and opinion addressed all five of Equitable Life's properties.

[5] The trial judge summed up the major limitations as follows:

On February 17, 1982, the Michigan Citizens Lobby contacted the Genesee Valley Center and informed the personnel there that it desired to come into the center to solicit signatures for a petition initiating legislation. The Citizens Lobby was told that the center had a written policy concerning the regulation of noncommercial and political activities and that the organization would be permitted to circulate its petitions in accordance with that policy. The Citizens Lobby was given a date in March 1982 on which it could engage in petitioning activity at the Genesee Valley Center.

The following day, February 18, 1982, the Michigan Citizens Lobby informed the center that their regulations violated Michigan law and that the Citizens Lobby would not comply with them. Later the center learned that the Citizens Lobby intended to circulate petitions in the mall on February 20, 1982, and that local authorities would not intercede.[6] The center contacted the Citizens Lobby and agreed to permit them to gather signatures on February 20, 1982, on a one-time-only basis, subject to less severe restrictions than those ordinarily imposed under the center's policy.

"Plaintiff would only permit defendant to solicit in accordance with plaintiff's established policy regulating noncommercial and political activities. That policy, which plaintiffs assert is uniformly enforced, includes the following: each organization must register five working days in advance of the day which they wish to solicit petition signatures including a detailed description of the proposed activity; the noncommercial activity must be conducted from a booth in a prescribed area of the mall and all activities must be carried on within two feet within any direction of the booth; no more than two representatives may be present at any given time; and the organization is limited to conducting its activities two hours per day on consecutive days, twice per year. A $100.00 security deposit to cover possible cleanup must be posted."

[6] The center was informed by the Flint Township Police Department that the Citizens Lobby intended to come into the shopping areas of the center to circulate petitions. The Flint Township Police further indicated that they would not enforce the Michigan trespassing statute, MCL 750.552; MSA 28.820(1).

On February 20, 1982, the Citizens Lobby conducted its initiative activity on the center premises. The Citizens Lobby informed the center that they intended to return to the center on each successive Saturday and perhaps more often until their petitioning campaign was completed and that they did not intend to comply with the center's written policy. Subsequently, the Citizens Lobby informed Equitable Life that it intended to pursue solicitation activities at Equitable Life's other Michigan shopping centers,[7] and intended not to comply with the written policy at those centers either.

On February 24, 1982, Equitable Life Assurance Society, and others, filed a verified complaint in the Genesee Circuit Court, seeking a declaratory judgment and preliminary and permanent injunctions, to prevent the Michigan Citizens Lobby and others from entering onto Equitable Life's properties for the purpose of engaging in noncommercial activity of any nature or, in the alternative, to declare that Equitable Life's policy permitting limited noncommercial activity constituted reasonable time, place, and manner restrictions with which the Michigan Citizens Lobby must comply. On the same date, Equitable Life also filed a motion for an ex parte temporary restraining order enjoining any noncommercial activities by the Michigan Citizens Lobby on Equitable Life's properties.[8] The trial judge did not grant the motion,

[7] See n 4.

[8] On February 24, 1982, Equitable Life also filed an action against the Flint Township Police Department, the Genesee County Sheriff's Department, and the Genesee Prosecuting Attorney, seeking a writ of mandamus compelling the enforcement of Michigan's trespass statute, MCL 750.552; MSA 28.820(1), against any persons coming onto Equitable Life's Genesee Valley Center property for the purpose of petitioning or engaging in other noncommercial activity in violation of the center's policy. The trial judge consolidated this action with Equitable Life's action against the Michigan Citizen's Lobby.

but instead scheduled a hearing for February 26, 1982 on the propriety of issuing a temporary restraining order. Following the hearing, the trial judge issued a temporary restraining order in favor of the Citizens Lobby.

On March 3, 1982, the Michigan Citizens Lobby answered Equitable Life's complaint and filed a counterclaim for declaratory relief and preliminary and permanent injunctions barring Equitable Life from interfering with its rights of petition, assembly, expression, press, and the initiation of legislation in the general public areas, including interior mall areas, of all shopping centers owned or managed by Equitable Life in Michigan, subject to reasonable time, place, and manner restrictions. Both sides moved for summary judgment and a preliminary injunction. The Michigan Citizens Lobby also requested permanent injunctive relief. An evidentiary hearing took place on April 8, 1982. At the conclusion of the hearing, because the parties sought relief with respect to all five of Equitable Life's shopping centers, the trial court indicated that it would take jurisdiction to consider injunctive relief with respect to all five shopping centers so far as the legal and factual issues presented at those centers were identical to those raised in the Genesee Valley Center litigation.[9] On March 14, 1983, the trial court rendered an opinion. The court neither granted nor denied the motions, but rendered an opinion on the controlling question of law, and stated:

> [U]nder the Michigan Constitution, a right of access in the mall area of a large private shopping center can exist for the purpose of soliciting signatures on an initiative proposal where the activity comports with the public nature of the property

[9] See n 4.

and does not unreasonably impair the value or use of the property as a shopping center.

The trial court stated that this determination must be made on a case-by-case basis and that an evidentiary hearing would be conducted to determine the public nature of Equitable Life's shopping malls and the detrimental effect that the Citizens Lobby's activities would have on Equitable Life's interests. On May 16, 1983, the trial judge issued an order in accordance with his opinion.[10]

The Court of Appeals granted Equitable Life's application for leave to appeal. This Court granted Equitable Life's application for leave to appeal prior to a decision by the Court of Appeals, and also granted leave to appeal in the Woodland case, 418 Mich 955 (1984).

I

The issue present in these appeals is not simply whether the provisions of the Michigan Constitution involved authorize initiative activity at large private malls. Nor is it accurate to frame the issue presently considered as whether the Michigan Constitution provides greater protection for expressive activity than the federal constitution. Rather, because private property and private conduct is involved, the primary question is whether the provisions of the Michigan Constitution involved reach such private conduct and property at all. This threshold issue must be directly confronted and adequately resolved before the merits of an alleged constitutional violation may be considered.

[10] In its order and partial declaratory judgment, the trial court ordered an evidentiary hearing to determine the public nature of Equitable Life's shopping centers and the detrimental effect that the Citizens Lobby's activities would have on Equitable Life's interests.

Our disposition of these cases makes it unnecessary to decide whether, if interpreted as protecting a constitutionally mandated right of access to the mall areas of large private shopping centers, the provisions of the Michigan Constitution here in question would infringe upon the mall owners' private property, free speech, and association rights protected by the federal and state constitutions. US Const, Ams I, V, XIV; Const 1963, art 1, §§ 3, 5, 17, and art 10, § 2. We note however, that unlike other more difficult issues presented by these cases, there is established and well-reasoned constitutional doctrine with which to analyze and decide this issue.

That a state may, through the valid exercise of its police power, adopt reasonable restrictions on the use of private property is well-established.[11] Writing for the United States Supreme Court in *PruneYard Shopping Center v Robins,* 447 US 74, 81; 100 S Ct 2035; 64 L Ed 2d 741 (1980), Justice Rehnquist said:

> It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision. [Citation omitted.]

The *PruneYard* Court directly addressed, within the factually similar circumstances of that case, whether the appellant's (shopping center) constitutionally protected private property, free speech, and association rights had been unreasonably infringed upon because of the right of access granted to the appellees by the California Constitution to exercise the rights of expression and petition on

[11] See, *e.g., Village of Euclid v Ambler Realty Co,* 272 US 365; 47 S Ct 114; 71 L Ed 303 (1926); *Young v American Mini Theatres, Inc,* 427 US 50; 96 S Ct 2440; 49 L Ed 2d 310 (1976).

appellants' property.[12] The Court concluded that "neither appellants' federally recognized property rights nor their First Amendment rights [had] been infringed . . . ." *Id.,* 88.

That the state constitution may afford greater protections than the federal constitution is also well-established and is based on fundamental constitutional doctrine and principles of federalism.[13] The Michigan Constitution has been interpreted as affording broader protection of some individual rights also guaranteed by the federal constitution's Bill of Rights.[14] The Michigan Constitution has never been so interpreted in the free expression and petition context.[15] Nevertheless, it is clear that the Michigan Constitution may afford broader free expression and petition protections against government infringements. Moreover, Michigan may, consistent with the federal constitution, extend protection against private interference as well, by statute or the state constitution, including the granting of an affirmative right of access to private property in some circumstances. The issue in these cases, however, is not whether the Michigan

---

[12] 447 US 74, 82-88.

The appellant in *PruneYard* challenged the decision of the California Supreme Court as violative of the Takings Clause of the Fifth Amendment, the due process requirement of the Fourteenth Amendment, and the free speech and association provisions of the First Amendment of the United States Constitution.

[13] See, *e.g., Oregon v Hass,* 420 US 714; 95 S Ct 1215; 43 L Ed 2d 570 (1975); *Cooper v California,* 386 US 58; 87 S Ct 788; 17 L Ed 2d 730 (1967).

[14] See, *e.g., People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975); *People v Moore,* 391 Mich 426; 216 NW2d 770 (1975); see also n 22, and cases and commentary cited therein.

[15] See Kelman, *Forward: Rediscovering the state constitutional bill of rights,* 27 Wayne L R 413, 416, n 10, and cases cited therein and accompanying text. See also, *e.g., Book Tower Garage, Inc v UAW Local No 415,* 295 Mich 580; 295 NW 320 (1940); *People v Neumayer,* 405 Mich 341; 275 NW2d 230 (1979).

Constitution may afford such an affirmative right, but whether it does.[16]

## II

After some doctrinal development, the United States Supreme Court decisively held that large private shopping centers are not subject to the prohibitions of the First Amendment. *Hudgens v NLRB,* 424 US 507; 96 S Ct 1029; 47 L Ed 2d 196 (1976); *Lloyd Corp, Ltd v Tanner,* 407 US 551; 92 S Ct 2219; 33 L Ed 2d 131 (1972). The Court rejected the contention that a privately owned retail shopping center was the "functional equivalent" of the business district in *Marsh v Alabama,* 326 US 501; 66 S Ct 276; 90 L Ed 265 (1946).[17]

The Citizens Lobby contends that, unlike the First Amendment to the United States Constitution, the free speech, assembly, and petition provisions of the Michigan Declaration of Rights are not limited to protection only against state or governmental action.

Const 1963, art 1, § 3 reads:

> The people have the right peaceably to assemble, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances.[18]

Art 1, § 5 reads:

---

[16] The dissent's focus is misplaced to this extent. By interposing and discussing the issue whether a state constitution may protect such an affirmative right of access to private property first, the dissent tends to obscure the primary issue (at least chronologically) of whether the Michigan Constitution does afford such a right.

[17] In *Marsh,* the United States Supreme Court held that the First Amendment protected a right to distribute religious literature on the streets of a company-owned town.

[18] Art 1, § 3, has remained basically the same since 1835. Const 1835, art 1, § 20; Const 1850, art 18, § 10; Const 1908, art 2, § 2.

Every person may freely speak, write, express
and publish his views on all subjects, being respon-
sible for the abuse of such right; and no law shall
be enacted to restrain or abridge the liberty of
speech or of the press.[19]

The Citizens Lobby asserts that § 3, and the first
clause of § 5, are not expressly limited to protec-
tion against government abridgments, in contrast
to the free speech, assembly, and petition provi-
sions of the First Amendment:

Congress shall make no law . . . abridging the
freedom of speech, or of the press; or the right of
the people peaceably to assemble, and to petition
the Government for a redress of grievances. [US
Const, Am I.]

The primary issue presented, therefore, requires
a determination concerning whether these provi-
sions of the Michigan Constitution include an
implied state action limitation or are directly ap-
plicable against private entities as well.

The firmly established doctrine that constitu-
tionally guaranteed individual rights are drawn to
restrict governmental conduct and to provide pro-
tection from governmental infringement and ex-
cesses is not unique to the federal Bill of Rights.

---

[19] In 1835, the provision was written with the structure it now has:
the first clause recognized in every person a right of free speech; the
second clause prohibited laws that abridged this right. Const 1835, art
1, § 7. In 1850, the order of the clauses was reversed, with the
prohibition on laws abridging speech appearing first. Const 1850, art
4, § 42. In 1908, the original 1835 order of the clauses was again
adopted, Const 1908, art 2, § 4, and this order was maintained in the
1963 Constitution.

In 1963, some minor changes were made in the free speech provi-
sion. While the 1908 Constitution stated that "[e]very person may
freely speak, write and publish his sentiments on all subjects," Const
1908, art 2, § 4, the new language states that "[e]very person may
freely speak, write, *express* and publish his *views* on all subjects
. . . ." Const 1963, art 1, § 5. (Emphasis added.)

This has generally been the view with respect to state bills of rights as well. See Rottschaefer, American Constitutional Law, § 305 (1939); McLain, Constitutional Law (2d ed), § 205, p 294 (1910); Cooley, Constitutional Law (3d ed), ch 12, p 219 (1898). This fundamental concept concerning the reach of constitutionally guaranteed individual rights is deeply rooted in constitutional tradition and is consistent with the very nature of our constitutional democracy. The Michigan Constitution's Declaration of Rights provisions have never been interpreted as extending to purely private conduct; these provisions have consistently been interpreted as limited to protection against state action. See, *e.g., Cramer v Metropolitan Savings & Loan Ass'n,* 401 Mich 252; 258 NW2d 20 (1977) (due process), *cert den* 436 US 958 (1978); *Harvey v Aetna Life Ins Co,* 72 Mich App 285; 252 NW2d 471 (1976) (equal protection).[20]

The Citizens Lobby, in dismissing the relevance of the state action argument, distinguishes the phraseology of the Michigan Constitution's provisions from those of the federal constitution because the latter express a "negative right" and use "prohibitory language," while the former grant a "positive right" and use "declaratory language." This distinction is less than persuasive in reaching the conclusion that the state action argument is irrelevant. In interpreting provisions of the Michigan Constitution to determine whether these provisions afford broader protection than their federal counterparts, this Court has not been persuaded

---

[20] See also, *e.g., Grand Rapids v Impens,* 414 Mich 667; 327 NW2d 278 (1982) (*Miranda* warnings); *People v Holloway,* 82 Mich App 629; 267 NW2d 454 (1978) (search and seizure); *Dow v Michigan,* 396 Mich 192; 240 NW2d 450 (1976) (due process); *Commodities Export v Detroit,* 116 Mich App 57; 321 NW2d 842 (1982); *People v Hubbard,* 115 Mich App 73; 320 NW2d 294 (1982). See generally Note, *Post-*PruneYard *access to Michigan shopping centers: the "malling" of constitutional rights,* 30 Wayne L R 93 (1983).

by textual differences. For example, although the freedom of religious belief provision, art 1, § 4, is textually dissimilar from the religion clauses of the First Amendment,[21] this Court has held that the state provision is "an expanded and more explicit statement of the establishment and free exercise clauses of the First Amendment" and, "accordingly, subject to similar interpretation." *Advisory Opinion re Constitutionality of 1970 PA 100,* 384 Mich 82, 105; 180 NW2d 265 (1970).

In contrast, other provisions of the Michigan Constitution which are worded identically to their federal counterparts have been interpreted to be substantively different. The double jeopardy provision of the Michigan Constitution, art 1, § 15, for example, has been interpreted as affording broader protection than the Fifth Amendment Double Jeopardy Clause.[22] These variations in phraseology are not dispositive of the state action issue.

---

[21] Art 1, § 4 reads:

"Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."

*Cf.* the religious freedom provisions of the First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." US Const, Am I.

[22] See *People v Jankowski,* 408 Mich 79; 289 NW2d 674 (1980); *People v White,* 390 Mich 245; 212 NW2d 222 (1973). See generally Note, *People v Carter,* 61 Det J Urb L 505 (1984). But see *People v Robideau,* 419 Mich 458; 355 NW2d 592 (1984).

The double jeopardy provision of the Michigan Constitution reads: "No person shall be subject for the same offense to be twice put in jeopardy. Const 1963, art 1, § 15. *Cf.* the Double Jeopardy Clause of the Fifth Amendment: "Nor shall any person be subject for the same offense to be twice put in jeopardy . . . ." US Const, Am V.

It has been noted, by at least one commentator, that the Michigan Constitution's equal protection provision, Const 1963, art 1, § 2, which

In *Bloss v Paris Twp,* 380 Mich 466, 472; 157 NW2d 260 (1968), this Court quoted the following passage with approval from 16 CJS, Constitutional Law, § 213, p 1108 (since revised and renumbered, see CJS, volume 16B):

> The constitutional provisions do not add anything to the rights of one citizen as against another and do not inhibit action by individuals with respect to their property. So the right to speak freely does not sanction a trespass, and does not imply the right to make a speech or distribute literature on another's private premises without his permission. In other words, the right to free speech and writing is not one to force speech and writing on an unwilling audience or readers, and the constitutional guaranty does not authorize a citizen to appropriate to his own use public or private property in a community for the purpose of exercising that guaranty.

The passage was quoted in *Bloss* in response to a claim of protection under the United States Constitution's First Amendment. Although this Court has not directly considered whether the rights of free expression and petition protected in the Michigan Constitution's Declaration of Rights include the requirement of state action, it has implied that this requirement or limitation exists.[23] In *Book*

___

is worded substantially the same as its federal counterpart, has been interpreted differently than the Equal Protection Clause of the Fourteenth Amendment. See Kelman, n 17 *supra,* pp 427-428, ns 60-69, and accompanying text.

In its recent decision in *Delta Charter Twp v Dinolfo,* 419 Mich 253; 351 NW2d 831 (1984), this Court, in addressing a due process challenge to a zoning ordinance, interpreted the due process protections of the Michigan Constitution differently than the requirements of the federal constitution.

[23] It has been noted that in the area of free expression this Court has closely followed the United States Constitution's First Amendment protections. See Kelman, n 15 *supra* at 416, n 10 and accompanying text.

*Tower Garage, Inc v UAW Local No 415,* 295 Mich 580, 587; 295 NW 320 (1940), this Court said that "[t]he same liberty of speech . . . is secured by the Constitution of the State of Michigan" as is guaranteed by the First Amendment.

The history of Michigan's Constitutional Convention supports the proposition that, generally, the reach of individual rights afforded by the Michigan Constitution is limited to protection against government. A debate concerning the state action requirement took place during the Constitutional Convention that preceded the adoption of the Michigan Constitution of 1963. The debate specifically concerned the necessity of the state action requirement with regard to art 1, § 2 (the equal protection provision).[24] Addressing whether this section regulates the actions of private parties as well as the government, the Chairman of the Committee on Rights, Suffrage and Elections, James Kerr Pollock, stated:

> This is not a directly enforceable provision in regard to private persons. . . . The majority of the committee considered this preferable, both because, as a general proposition, constitutional limitations should serve to restrain governmental action and not to define private duties, and because the areas in which private discrimination should be forbidden, the extent to which discrimination is prohibited, and the sanctions to be applied are matters that we think are appropriately left for legislation. [1 Official Record, Constitutional Convention 1961, p 742.]

A minority proposal was introduced which would have extended the reach of this provision to

---

[24] Art 1, § 2 states: "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."

cover disputes between private parties. This minority proposal was rejected by the convention. *Id.,* p 750. The majority proposal was then unanimously adopted. *Id.,* p 760. Although the focus of the above exchange was art 1, § 2, it indicates the support of the drafters for the general proposition that the state Declaration of Rights is concerned with governmental infringement and leaves regulation of private conduct to the Legislature.[25]

---

[25] Other evidence that an implicit state action limitation to the provisions of the Michigan Constitution is generally recognized was advanced in these cases. Appellant Equitable Life quoted a passage from some materials circulated by the Citizens Research Council prior to the constitution's ratification:

" 'The enumeration and definition of rights in the field of individual relations have traditionally rested, however, with statute law (legislative prescription) and have not commonly been taken note of in constitutional law. Thus, the reluctance of the Convention to enter the fields of social and economic rights of individuals leaving this to the legislature, extends the reliance on a traditional solution . . . .' Citizens Research Council, *A Digest of the Proposed Constitutional Report,* No 213 at 10-11 (Nov, 1961)."

Appellant Equitable Life also quoted a statement made by the Committee on Declaration of Rights in presenting art 1, § 5 (free speech), to the Convention:

" 'Here again is a traditional guarantee of American liberty, now covered largely by the extension of federal constitutional guarantees against the states, which the Committee nonetheless believes it wise to continue to incorporate in Michigan's fundamental law.' " 1 Official Record, Constitutional Convention 1961, p 466.

Similarly, appellee Woodland quotes from University of Michigan Professor Paul G. Kauper's research paper for the Convention, noting that his comments applied to the entire Declaration of Rights:

" 'The classic concept of basic rights in the American constitutional tradition is that these rights are retained by the people as against limitations and infringements by actions of the government. The rights a person has against third persons are defined by common law and statute. These are not ordinarily regarded as constitutional matters. The principle that a state shall not deprive a person of his life without due process of law is a constitutional matter, but constitutions do not make it a crime for an individual to take another's life. This is governed by the criminal laws.

" 'If all civil rights, in the sense of rights which a person may assert against his fellow citizens, were to be incorporated in the constitution, the distinction between the constitution as fundamental law—defining the frame of government and the relation of the government to the citizen—and the general laws of the state—defining rights and obligations arising out of private relationships—would be lost.' Kauper, *The*

Although there are obvious differences in nature between the federal and state constitutions, some of the underlying purposes and rationale supporting the requirement of state action are equally applicable.[26] State constitutions and governments are not subject to the same inherent constraints that limit the federal constitution and government. The United States Constitution grants limited authority to the federal government to exercise only those powers that have been expressly or impliedly delegated to it. State constitutions, by contrast, serve as limitations on the otherwise plenary power of state governments.

Therefore, the federalism concern, which is a primary principle supporting the state action requirement of the federal constitution, is, obviously, not a concern with respect to the state constitution.[27] Other concerns that have been said to support the federal state action requirement, however, are directly applicable to the state constitution: the doctrines of private autonomy and separation of powers.

Professor Lawrence Tribe, in his noted treatise, Constitutional Law, has explained:

> [B]y exempting private action from the reach of the Constitution's prohibitions, it stops the Constitution short of preempting individual liberty—of denying to individuals the freedom to make certain choices. . . . Such freedom is basic under any

State Constitution, Its Nature and Purpose (Con-Con Research Paper No 2, Citizens Research Council of Michigan, October 1961), p 21."

[26] See Note, n 20 supra, for a good general discussion concerning the underlying values of the state action doctrine and how they support the state action limitation implicit in the Michigan Constitution.

[27] The significance of this major difference is that the state action limitation implicit in the state constitution does not limit the reach of state legislation in the same way that federal legislation may be restricted by express limitations in provisions of the federal constitution.

conception of liberty, but it would be lost if individuals had to conform their conduct to the Constitution's demands. [Tribe, American Constitutional Law, p 1149.]

A fundamental philosophical tenet underlying our constitutional system is that the preservation of the personal freedom of the individual is an important function of our federal and state governments and one of the primary reasons for limiting their activity. See Burke & Reber, *State action, congressional power and creditors' rights: An essay on the Fourteenth Amendment,* 46 S Cal L R 1003, 1016 (1973):

It is at the heart of the American libertarian tradition that the individual be given wide rein in structuring his relationships with other individuals, if only because the alternative of close governmental control threatens liberty itself.

The state action limitation is supported and reinforced by the separation of powers doctrine[28] because of the recognition that the courts are inherently limited, because of their institutional

[28] See Const 1963, art 3, § 2. Referring to the doctrine of separation of powers Justice COLEMAN wrote:

"We speak of that balance wheel built into our United States Constitution at its 1789 beginning and since preserved and known generally as the Separation of Powers doctrine. It has been a specific provision of all of Michigan's Constitutions commencing in 1835." *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 681-682; 232 NW2d 636 (1975) (COLEMAN, J., *dissenting*).

The state action limitation reinforces this doctrine by limiting the reach of constitutional provisions, generally, to conflicts between people and those who represent government in all its manifestations. This limitation stops the court from encroaching upon what is primarily a function of the Legislature acting pursuant to its police power and other constitutional powers. The regulation of the relationships between individuals or groups of individuals is not, generally, a concern of the constitution. The fundamental role of the constitution is to regulate the relationship between the government and the people.

character and role, to accomplish goals which are essentially legislative and political. This element of the state action requirement is supported by logic and practical considerations as well.[29]

In light of traditionally accepted notions of the limited reach of constitutionally guaranteed individual rights, the past decisions of this Court, the documented history of Michigan's most recent constitutional convention, and the underlying rationale of the state action limitation, it may not be presumed that the constitutional provisions here in question are intended to apply against private individuals or entities. If any presumption is to be raised it is to the contrary: that unless otherwise expressed, constitutionally guaranteed protections are applicable only against government. We find no indication or warrant that the people of this state, in adopting our constitution, intended either of these provisions to apply against private parties. Accordingly, we interpret Const 1963, art 1, § 3 and § 5 as implicitly limited to protection against state action. If the citizens of Michigan wish their constitution, in addition to serving as a shield against the actions of the state, to be used as a sword by individuals against individuals, there is a means by which this can be done. Art 12, § 2.

III

The Citizens Lobby also places heavy reliance directly on art 2, § 9, to support its claim of a right of access. The power of initiative and referendum

_____

[29] Limited to the adversary setting in adjudicating particular disputes, and to granting specific legal and equitable remedies, the court is less competent than legislative bodies to perform the factfinding and legislative functions. In the area of constitutional adjudication, these limitations become even more apparent.

with respect to laws[30] is reserved to the people in art 2, § 9, which provides, in part:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. . . . To invoke the initiative . . . petitions signed by a number of registered electors, not less than eight percent . . . of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.
>
> \* \* \*
>
> Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature.
>
> \* \* \*
>
> If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection. . . . The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject . . . and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election.

The final provision of art 2, § 9, states that "[t]he legislature shall implement the provisions of this section." Nevertheless, it is clear that art 2, § 9, is self-executing. As one author commenting on the

---

[30] The Michigan Constitution reserves to the people the power of initiative and referendum with respect to constitutional amendments as well. Const 1963, art 12, § 1 (referendum); art 12, § 2 (initiative).

Michigan initiative and referendum process has observed:

> The drafters of the [provision], concerned because the rights of the initiative and referendum were reserved in derogation of the legislature, expressly stated that . . . art 2, § 9, [was] to be self-executing and that "the legislature could not thwart the popular will by refusing to act." [Grossman, *The initiative and referendum process: The Michigan experience,* 28 Wayne L R 77, 83, n 35 (1981) (citing *Address to the People 21,* 2 Official Record, Constitutional Convention 1961, p 3367).]

The initiative provision set forth in art 2, § 9, is not expressed in terms of an individual right, but is reserved to the people collectively,[31] and serves as an express limitation on the authority of the Legislature. This reservation of legislative authority by the people, which reserves to the people the right to "legislate," does not make them a part of the government. In *Decher v Secretary of State,* 209 Mich 565, 572; 177 NW 388 (1920), this Court, in distinguishing between the legislative power vested in the Legislature and the right of initiative and referendum reserved to the people, said that

> [u]nder the provisions . . . as to initiative and referendum, the people have no power to enact legislation until the proposal therefor has been submitted by petition to the legislature for action thereon. The right of the people to thus legislate in no way makes them a part of the legislature . . . .

The interpretation of this provision of the state constitution that the Citizens Lobby urges us to adopt is premised upon a number of presumptions.

---

[31] Compare art 2, § 9, with the individual rights protected in art 1, §§ 1-21, the "Declaration of Rights."

First, it presumes that art 2, § 9 is concerned with protecting an individual's right to gather signatures. Second, it presumes that this individual right protected by art 2, § 9, proscribes the conduct of private entities and implicitly confers a right of access to private property over the objection of its owner.

This interpretation stretches too far. The individual right to solicit signatures to qualify an initiative petition is protected by the rights of free expression, assembly, and petition, guaranteed in sections 3 and 5 of article 1, "The Declaration of Rights." The provisions of art 2, § 9 are not invoked until the requirements set forth therein have been complied with. This section of article 2, "Elections," is not concerned with protecting the individual right to solicit signatures or to petition government generally. If art 2, § 9 was intended to include a substantive right to gather signatures it would have been expressed, especially if it was intended to afford greater individual rights in this regard than are already protected by article 1. There is no such indication within the text of this constitutional provision. Art 2, § 9, is a reservation of legislative authority which serves as a limitation on the powers of the Legislature. This reservation of power is constitutionally protected from government infringement once invoked; once the petition requirements have been complied with, the state may not refuse to act. But even under the most liberal interpretation, this provision cannot be construed as conferring a right to be exercised by one private individual or entity against another. In *Leininger v Secretary of State,* 316 Mich 644, 653; 26 NW2d 348 (1947), this Court said the following with respect to the right of initiative:

Of the right of qualified voters of the State to

propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises. But the right is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution.

The Citizens Lobby argues that it is unreasonably difficult to obtain the required number of signatures to qualify an initiative petition (*i.e.,* eight percent of the total vote cast in the last gubernatorial election) without access to large shopping malls, because there are no *adequate* alternatives to reach the same people it seeks to reach in the malls and, therefore, that without a constitutional right of access to shopping malls the power of initiative is eviscerated. While there may be no similarly *convenient* alternate avenues, the practical difficulties of obtaining signatures without constitutionally mandated access to the malls has not been shown.[32]

---

[32] Actually, the Michigan citizenry has engaged in a substantial amount of initiatory activity, albeit primarily in the area of constitutional amendments requiring the signature of ten percent of the electorate rather than the eight percent required for statutory initiatives. However, since 1970, there has been substantial statutory initiative activity which has met with success at the polls.

There have been sixteen proposed amendments to the 1963 Constitution which originated by initiatory petition under Const 1963, art 12, § 2. Of these sixteen, five were approved by the voters. Michigan's use of the constitutional initiative was favorably commented upon in Grossman, *The initiative and referendum process: The Michigan experience,* 28 Wayne L R 77, 79-80, n 11 (1981):

"In terms of its use of the constitutional initiative process, Michigan is one of the more active states. Between 1970 and 1979, 11 constitutional amendments were proposed by initiative petition in this state. Only Colorado, with 12 initiated amendments during this period, exceeded Michigan; Ohio also had 11 initiated proposals. Further, throughout the entire country, only six constitutional initiatives were adopted by the voters in 1978-79. Three of those were passed in Michigan. COUNCIL OF STATE GOVERNMENTS, THE BOOK OF THE STATES 1980-81 4-5 (1981)."

The initiative process of art 2, § 9, was not intended to be easy to fulfill. During the Constitutional Convention, an effort to reduce the requisite number of signatures from eight percent to five percent[33] was strongly resisted and ultimately defeated. During the debate on the proposed reduction, delegate Kuhn observed of the procedure eventually adopted:

It's tough. We want to make it tough. It should not be easy. The people should not be writing the laws. That's what we have a senate and house of representatives for. [2 Official Record, Constitutional Convention 1961, p 2394.]

Indeed, the initiative process has been described as "assur[ing] the citizenry of a gun-behind-the-door to be taken up on those occasions when the legislature itself does not respond to popular demands." Lederle, "The Legislative Article," in Pealy (Ed), *The Voter and the Michigan Constitution in 1958,* p 47. This "gun-behind-the-door" was

There have been six statutory initiatives under Const 1963, art 2, § 9, which were submitted to the voters. Of these, five were approved by the people and enacted into law. These statutes enacted by the people include such areas as legislation to prohibit nonreturnable bottles and cans, 1976 PA, Initiated Law, MCL 445.571-445.576; MSA 18.1206(11)-18.1206(16), and legislation to restrict the parole of persons convicted of violent crimes, 1978 PA, Initiated Law, MCL 791.233; MSA 28.2303. The contemporary use of the statutory initiative under art 2, § 9, compares quite favorably with earlier usage. Under Const 1908, art 5, § 1, the statutory initiative was invoked only once. See Grossman, *supra,* p 79, n 11. Thus, during the same time period in which large shopping malls have proliferated, the use of the statutory initiative under art 2, § 9 has *increased* rather than decreased.

[33] The proponents of the reduction wanted to encourage the use of the statutory initiative over the constitutional amendment. Their reasoning was that since the amendatory initiative requires ten percent, while the statutory initiative requires eight percent, most initiative seekers obtain the additional signatures required for the amendatory process rather than stopping at the eight percent required for the statutory initiative. 2 Official Record, Constitutional Convention 1961, pp 2392-2394.

intended as a threat to the Legislature, not to
private property owners. Nowhere in the conven-
tion record is there any evidence of an intent to
grant rights of access to privately owned busi-
nesses as a means of effectuating art 2, § 9. In-
stead, the initiative process is intended as a last
resort for the people when the Legislature fails to
act on issues which so inflame the citizenry on a
grass-roots level that there is no need to trespass
upon privately owned property to reach disinter-
ested and unknowing citizens.

Nothing in the history or interpretation of the
precursor to art 2, § 9, provides a basis for a
different construction. In 1913, the people
amended the 1908 Constitution to provide a statu-
tory initiative, Const 1908, art 5, § 1, and a consti-
tutional amendatory initiative, Const 1908, art 17,
§ 2, that was less restrictive than that originally
provided. These 1913 constitutional amendments
reflected the popular distrust of the legislative
branch of our state government. In construing art
17, § 2, the constitutional amendatory initiative
provision, this Court said in 1924:

> The initiative found its birth in the fact that
> political parties repeatedly made promises to the
> electorate both in and out of their platforms to
> favor and pass certain legislation for which there
> was a popular demand. As soon as election was
> over their promises were forgotten, and no effort
> was made to redeem them. These promises were
> made so often and then forgotten that the elector-
> ate at last through sheer desperation took matters
> into its own hands and constructed a constitu-
> tional procedure by which it could effect changes
> in the Constitution and bring about desired legisla-
> tion without the aid of the legislature. [*Hamilton v
> Secretary of State,* 227 Mich 111, 130; 198 NW 843
> (1924).]

An even earlier Court said in 1918 that the people's right to propose constitutional amendments through the art 17, § 2, initiative process could "be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises." *Scott v Secretary of State,* 202 Mich 629, 643; 168 NW 709 (1918). Thus, just five years after the statutory and amendatory initiatives were adopted by the people, this Court discussed the resultant restrictions solely in terms of governmental actors. The purpose of Const 1963, art 2, § 9, from its inception in 1913 as Const 1908, art 5, § 1, was to limit the legislative branch of state government, not private individuals' use of privately owned property.

We are cognizant of the importance of the right of initiative in Michigan's constitutional scheme. We are also cognizant, however, of the role and importance of this Court in Michigan's constitutional scheme. Within this context, Justice COOLEY wrote:

> Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action . . . . They [the courts] must construe them as the people did in their adoption, if the means of arriving at that construction are within their power. [*Bay City v State Treasurer,* 23 Mich 499, 506 (1871) (cited in *Decher v Secretary of State,* 209 Mich 565, 569; 177 NW 388 (1920).]

The people, in adopting art 2, § 9, and art 12, § 2 of the Michigan Constitution of 1963 did not intend to regulate the conduct or property of private parties.

IV

The Citizens Lobby argues, alternatively, that if this Court is not inclined to completely dispense with a state action requirement, it should adapt the "public function" concept of *Marsh v Alabama, supra,* to apply the state constitution to Michigan shopping centers. While we agree that the state action limitation implicit in the state constitution may be interpreted independently, we are not inclined to adopt this subterfuge.

The Citizens Lobby cites the opinion of Justices BLACK and SMITH in *Amalgamated Clothing Workers v Wonderland Shopping Center,* 370 Mich 547; 122 NW2d 785 (1963), to support both the propositions that no state action limitation exists within the provisions of the Michigan Constitution, and that the "public function" concept of *Marsh* is applicable to shopping centers. Although *Amalgamated Clothing Workers* does not support the former proposition, it is relevant to the latter and, therefore, warrants some discussion.

In *Amalgamated Clothing Workers,* this Court divided equally (four to four)[34] when considering whether the rationale of *Marsh* was applicable to a shopping center. The Court, thus, affirmed the lower court's decree enjoining interference with the union's distribution of handbills urging people not to buy nonunion shirts, in front of the particular store and on the exterior sidewalk of the shopping center. *Amalgamated Clothing Workers* is of limited applicability, however, because the three opinions delivered in that case were based on the application of the First Amendment and federal constitutional doctrine (the state free

---

[34] At this point in the Michigan Supreme Court's history, there were eight justices sitting on the Court. See 1948 CL 601.1; MSA 27.1. See also Const 1963, schedule 6.

speech provision was not interpreted independently). Furthermore, *Amalgamated Clothing Workers* was decided before *Hudgens, supra,* and *Lloyd, supra,* in which the United States Supreme Court held that private shopping centers, unlike the company-owned town in *Marsh,* were not subject to the prohibitions of the First Amendment.

The opinion in *Amalgamated Clothing Workers,* in which Citizens Lobby wishes to find support, was based on an extension of the federal "public function" theory and constitutional analysis of *Marsh.* The opinion of Justices BLACK and SMITH analogized the shopping center in that case to the company-owned town in *Marsh,* stating:

> The facts in the case herein presented are similar to those in the *Marsh Case, supra.* The law contained therein is controlling. The defendants operate a shopping area which, although privately owned, is quasi-public in nature. [*Amalgamated Clothing Workers, supra,* 564 (BLACK and SMITH, JJ., *for modification and affirmance*).]

Justices BLACK and SMITH stated that the crux of the *Marsh* decision was that the company-owned town in that case lost its original identity as private property because of the extent and purpose of its invited and accepted public use. *Id.,* 565. To justify their conclusion that the shopping center should be treated as "public" property for purposes of the First Amendment and free speech provision of the state constitution, Justices BLACK and SMITH discussed the doctrine of common-law dedication "as an augmentive attestant of due applicability of the *Marsh Case . . . ." Id.* Summarizing the rules of common-law dedication, they stated:

> Private property may, by unceremonious act and

implication from act on the part of the landowner, and like act and implication from act on the part of the public, become subject to public easement by means of common-law dedication. The public right in such instance does not depend upon acceptance and use for any particular period of years. The fact of dedication and acceptance, and the extent of the dedicated use, must be determined from the intent of the dedicators and acceptors and the legal significations thereof. No particular form is necessary to such dedication. The fee does not pass. An easement does. There may be a public abandonment after acceptance, and reversion to the original owner, when the use for which the dedication was made becomes impossible of execution or where the object of the use fails. [*Id.,* 567.]

They were for affirming, in substance, the ruling of the lower court that

[t]he change from the operation of a single store by a storekeeper to a large, complex, multiple shopping center, alters the very nature of the operation from one of a purely private character to one of public or quasi-public character. The single storekeeper would still be entitled to prevent any unauthorized intrusion on his private property. The defendants . . . no longer can claim the same rights to their property. *The property of the defendants has lost its identity as private property.* [*Id.,* 564-565. Emphasis added.]

Chief Justice CARR, in contrast, found that the factual situation in *Amalgamated Clothing Workers* was not analogous to that of *Marsh.* Justice CARR stated:

We are not concerned here with a company-owned town exercising and performing in practical

effect the powers and functions of a municipal corporation . . . . It performs no governmental functions . . . . Its property, privately owned, is devoted to the carrying on of private business. [*Amalgamated Clothing Workers, supra,* 553. (CARR, C.J., *for reversal*).]

Justice CARR found, therefore:

[T]he means of access to such businesses as are conducted by the tenants therein have been provided for the use of those who desire for business reasons to visit the stores, shops, and other business places. In view of the apparent theory on which the decision of the majority of the court in *Marsh* was based, we are not in accord with the claim that the holding is controlling in the instant controversy. [*Id.*]

Justice CARR concluded:

In the instant case plaintiff is seeking the aid of equity to enable it to send its representatives upon the property of defendants, and upon other properties of like nature, in connection with the promotional campaign in which it is engaged. The cases cited in support of its position do not support a conclusion that the property of defendants, the shopping center in question here, is so dedicated to use by the public generally as to vest in plaintiff, or others, the right to make use thereof in connection with the promotion of interests sought to be advanced. [*Id.,* 561.]

Justice O'HARA concurred in the result reached by Chief Justice CARR, but wrote separately to express his opinion that the right of free speech

was not involved at all.[35] *Id.,* 574 (O'HARA, J., *for reversal*).

Other state supreme courts had considered extending the "public function" doctrine of *Marsh* to subject large shopping centers to the prohibitions of the First Amendment prior to the United States Supreme Court having done so in *Amalgamated Food Employees Local 590 v Logan Valley Plaza, Inc,* 391 US 308; 88 S Ct 1601; 20 L Ed 2d 603 (1968), by reasoning that the shopping center complex in that case was the "functional equivalent of the business district . . . in *Marsh,*" *id.,* 318, over the strong dissent of Justice BLACK, who authored the Court's opinion in *Marsh, supra.* See Cohen, *PruneYard Shopping Center v Robins: Past, present and future,* 57 Chicago Kent L R 373, 381, n 46 (1981).

Shortly after its decision in *Logan Valley,* however, the Supreme Court declined such an extension in *Lloyd Corp v Tanner, supra,* and then expressly rejected *Logan Valley's* rationale in *Hudgens v NLRB, supra.* In *Hudgens* the Court said:

It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state. [Citation omitted.] Thus, while statutory or

[35] Of the constitutional guarantee of freedom of speech, Justice O'HARA wrote:

"Freedom of speech is a constitutional safeguard against the growth of tyranny which has historically followed the suppression of the right to speak out on all subjects of man's intellectual inquiry. Secured earlier it would have protected Galileo against ecclesiastical tyranny, Voltaire from governmental tyranny. It permitted Robert Ingersol to stand on the public platform and invite the God he professed not to believe in to strike him dead. It secured to organized labor the right to publicize the existence of controversy between employer and employee by peaceful picketing. Its absence doomed Socrates to the hemlock and Copernicus to the posthumous publication of his astronomical observations." *Amalgamated Clothing Workers, supra,* 574 (O'HARA, J., *for reversal*).

common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself. [*Hudgens, supra,* 513.]

After limiting *Marsh* to situations in which a company-owned town has assumed all of the characteristics of a municipality, the Court held that the protections afforded by the First Amendment do not apply against the private owners of private shopping centers. *Id.,* 518. See also *Flagg Brothers, Inc v Brooks,* 436 US 149; 98 S Ct 1729; 56 L Ed 2d 185 (1978).

We recognize that adapting the federal "public function" doctrine to the shopping centers in these cases would be a limited exception to the state action requirement as opposed to a complete dispensation of it; this approach would simply treat the shopping centers as if they were the state for purposes of the state constitution's free speech and petition provisions. As the Connecticut Supreme Court noted in *Cologne v Westfarms Associates,* 192 Conn 48, 64; 469 A2d 1201 (1984), however, there is no legal basis to distinguish shopping malls from other places where large numbers of people congregate, thereby affording superior opportunities for political activities, such as sport stadiums, convention halls, theaters, private parks, large office or apartment buildings, factories, supermarkets, department stores, or similar places. We find the reasoning of Chief Justice CARR in *Amalgamated Clothing Workers, supra,* compelling. As the United States Supreme Court stated in *Lloyd, supra,* 569:

[P]roperty [does not] lose its private character

merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center.

## V

A number of other jurisdictions have recently considered similar issues with regard to their state constitutions. These cases have resulted in some remarkably close decisions[36] and have spurred a

---

[36] The California Supreme Court's decision in *Robins v PruneYard Shopping Center,* 23 Cal 3d 899; 153 Cal Rptr 854; 592 P2d 341 (1979), was reached on a vote of four-three. The Washington Supreme Court in *Alderwood Associates v Washington Environmental Council,* 96 Wash 2d 230; 635 P2d 108 (1981), divided four-one-four in reaching a decision.

The Supreme Judicial Court of Massachusetts recently considered a similar issue in *Batchelder v Allied Stores Int'l, Inc,* 388 Mass 83; 445 NE2d 590 (1983). The Massachusetts court's decision in *Batchelder* was not based upon the state free speech provision, but was expressly limited to the "free election" provision of the Massachusetts Constitution which states:

"All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments." *Id.,* 88, n 6 (citing Mass Const, art 9).

In a four to three decision the Court held that article 9 of the Massachusetts Constitution does not include a state action requirement and, therefore, protects the right of a candidate to solicit signatures in private shopping centers in support of his nomination to run for public office.

In *Cologne v Westfarms Associates,* 192 Conn 48; 469 A2d 1201 (1984), the Connecticut Supreme Court, in a three to two decision, held that the free speech and petition provisions of that state's constitution are not applicable to private shopping centers. The North Carolina Supreme Court was unanimous in rejecting such a claim with respect to the Constitution of North Carolina in *State v Felmet,* 302 NC 173; 273 SE2d 708 (1981).

great deal of commentary.[37] Although many have come out in favor of granting a limited right of access to certain types of private property and for certain types of activity, their reasoning has not been consistent.

In *Robins v PruneYard Shopping Center,* 23 Cal 3d 899; 153 Cal Rptr 854; 592 P2d 341 (1979), the California Supreme Court held that the free speech and petition provisions of the California Constitution protected a right of access in the common areas of a privately owned shopping mall.[38] The California Court, in *Robins,* did not directly address whether the California Constitution's Bill of Rights included a state action limitation. Instead, the majority and dissenting opinions in *Robins* focused on whether interpreting the state constitution as protecting a right of access to private shopping malls was violative of the mall owners federally guaranteed constitutional rights.[39]

Two state supreme courts have considered related issues with regard to a private university and college. In *State v Schmid,* 84 NJ 535; 423 A2d 615 (1980), the New Jersey Supreme Court held that its state constitution protected the rights of free speech and assembly on the campus of a private university. Similarly, the Supreme Court of Pennsylvania reached the same result in *Commonwealth v Tate,* 495 Pa 158; 432 A2d 1382 (1981). Both of these decisions emphasized the dedicated use of university or college property as a forum for the exchange of opinions and ideas.

[37] See, *e.g.,* Cohen, *supra;* Utter, *The right to speak, write, and publish freely: State constitutional protection against private abridgement,* 8 U Puget Sound L R 157 (1985); Wachs, *Access to private fora and state constitutions: A proposed speech and property analysis,* 46 Alb L R 1501 (1982); Simon, *Independent but inadequate: State constitutions and protection of freedom of expression,* 33 U Kan L R 305 (1985); Note, *Post-*PruneYard *access to Michigan shopping centers: The "malling" of constitutional rights,* 30 Wayne L R 93 (1983); *Developments in the law, the interpretation of state constitutional rights,* 95 Harv L R 1324 (1982); Note, *Private abridgment of speech and the state constitutions,* 90 Yale L J 165 (1980); Barnett, *A private mall becomes a public hall,* 26 Loyola L R 739 (1980).

[38] In *PruneYard,* a group of high school students sought access to a large shopping center to solicit signatures in support of a petition protesting a United Nations resolution concerning Zionism.

[39] The California courts, it seems, have now extended the *Robins*

The majority in *Robins,* 908, concluded that the state constitution's rights of free speech and petition "justified reasonable restrictions on private property rights." In reaching its decision the majority seems to have applied a balancing of the conflicting private interests involved.

In *Alderwood Associates v Washington Environmental Council,* 96 Wash 2d 230; 635 P2d 108 (1981), the Washington Supreme Court sharply divided in deciding the issue whether the free speech, petition, and initiative provisions of the Washington Constitution protected a right of access to privately owned shopping centers.[40]

A plurality of four justices, in adopting a balancing of the competing private interests approach, did address the state action issue and concluded that no such limitation exists in the Washington Constitution. *Alderwood,* 239-246. See Utter, *The right to speak, write, and publish freely: State constitutional protection against private abridgement,* 8 U Puget Sound L R 157, 181 (1985).[41]

In distinguishing the *Alderwood* plurality's balancing approach from the "public function" doctrine of *Marsh, supra,* Justice Utter explained:

> Under the federal public function doctrine, the court will find "state action" only when the private person or entity is engaged in an activity that is a *traditional and exclusive function of government.*
>
> * * *
>
> In contrast, the plurality's analysis [in *Alder-*

decision to apply to small shopping centers as well as large ones. See *Bill Press v Lucky Stores, Inc,* 34 Cal 3d 311; 193 Cal Rptr 900; 667 P2d 704 (1983).

[40] *Alderwood* involved a citizens group seeking to gather signatures for an initiative petition.

[41] This article was written by the author of the plurality opinion in *Alderwood.*

*wood*] does not require any such government-like activity. Rather, the . . . test simply allows the court to consider as one factor the extent to which private property resembles a public *place*. Not only may speech rights be protected on property that is used for activities that have never been traditional or exclusive functions of government, but the property need not even be particularly public for speech to be protected thereon if other factors militate in favor of protection. [*Id.*, 185. Emphasis in original.]

Justice Utter contrasted this balancing approach under the Washington Constitution with the applicable standards of the federal constitution. He stated that the *Alderwood* plurality's balancing approach is also applicable to cases involving governmental infringement, and, thus, no higher level of scrutiny is required.[42] *Id.*, 182-183.

The claim, upon which the *Alderwood* plurality's balancing approach is premised, that there is no state action limitation in the Washington Constitution's Declaration of Rights, was rejected by a majority of the *Alderwood* court itself.[43]

Justice Dolliver dissented vehemently to the constitutional analysis adopted by the plurality in *Alderwood,* but, nevertheless, concurred in result through a separate analysis based solely on Washington's initiative provision. Dissenting to the open-ended "balancing of interests" constitutional

[42] Justice Utter explained, however, that even when a governmental interest prevails over free speech rights under the Washington Constitution, the governmental activity in question would also be subject to the First Amendment because "state courts must also rely on the federal Constitution and provide the amount of protection required under that document," in situations in which the Washington Constitution provides less protection than is provided under the federal constitution. *Id.*, 184, n 140.

[43] Four justices joined in the plurality opinion; four dissented. Justice Dolliver concurred in result only and expressly rejected the plurality's claim that the Washington Constitution does not require state action.

analysis adopted by the plurality in *Alderwood*
because it totally disregarded the Washington Con-
stitution's state action limitation, Justice Dolliver
said:

> While this court has in the past declared the
> substance of the Washington Constitution may
> differ from that of similar provisions of the United
> States Constitution . . . this is the first time the
> court has held the Declaration of Rights in our
> constitution is designed not just to protect the
> individual from government but that it may also
> be used by one individual against the other. It is
> constitution making by the judiciary of the most
> egregious sort.

* * *

> This court . . . should not expand its views of
> the fundamental meaning of the constitution—and
> thus the power of the court—at the expense of the
> will of the people. See G. Deukmejian & C. Thomp-
> son, *All Sail and No Anchor—Judicial Review
> Under the California Constitution,* 6 Hastings
> Const L Q 975 (1979). As it articulates constitu-
> tional rights it "chooses" to declare, the majority
> also arrogates to the court powers undreamed of
> by those who wrote and those who adopted our
> constitution.

> The majority opinion represents a determination
> by the court that it, instead of the legislature, will
> settle conflicting interests among citizens and that
> it will accomplish this by what it chooses to call a
> constitutional basis . . . . Now the court will be
> able to dispense with the inconvenience and cum-
> bersomeness of legislative activity.

* * *

> Now there is no limit to the range of wrongs
> which this court may right—subject only to the
> court's notion of balancing interests. [*Alderwood,
> supra,* 248-251 (Dolliver, J., *concurring in result*).]

Justice Dolliver based his decision on the police

power and Washington statutes and case law which have implemented and construed amendment 7 of the Washington Constitution, the initiative provision. Justice Dolliver distinguished Washington's initiative provision by characterizing initiative activity as quasi governmental and equating the gathering of signatures to the governmental act of "legislating."[44]

The dissent in *Alderwood* (four justices), agreed with the objections of the concurrence to the plurality's application of a "balancing test" in resolving that case. The dissent also disagreed, for many of the same reasons, with the concurrence's analysis.[45] The dissent agreed that a state may adopt reasonable restrictions on private property in the exercise of its police power, but said that no right had been given, by either Washington's Constitution or statutes, authorizing persons to collect initiative signatures on private property against the will of its owners. *Alderwood, supra,* 253 (Stafford, J., *dissenting*).

---

[44] Justice Dolliver stated:

"It should be noted that the initiative process is not a 'right' against government . . . . Rather, amendment 7 [the right of initiative] is a declaration by the people in their constitution that they are part of the legislative process. Amendment 7 declares not that the people have a right against government but that the people are part of the apparatus of government—the legislative branch. As a part of government the initiative process may be exercised, as may other aspects of government, only in such a way as not to restrict the use of private property so as to amount to a taking." *Alderwood, supra,* 253 (Dolliver, J., *concurring in result*).

[45] "One problem with the constitutional interpretation by both the majority and the concurrence is that neither seems to have a logical stopping point. Counsel for the defendants (petitioners) conceded in oral argument that, if a private person's home was on the busiest corner of the city and hence the best available place from which to gather signatures, the collector's alleged constitutional right would compel the homeowner to allow a card table to be set up on his front lawn. Neither the majority nor the concurrence's resolution of this case appears to preclude such an absurd extension of the new found right to collect signatures on private property (and the concomitant reduction in basic property rights)." *Alderwood, supra,* 254, n 10 (Stafford, J., *dissenting*).

We agree with the dissent in *Alderwood* that the regulation of private property analysis is misplaced in resolving these issues, and we therefore find it inapplicable to the present cases.

Furthermore, we reject the Citizens Lobby's suggestion that we adopt a "balancing of the competing interests" constitutional analysis in these cases by which the importance of the rights of free speech, petition, and initiative, are balanced against the rights of the shopping centers in controlling and operating their private property. In addition to completely ignoring the state action limitation in our state's constitution, this open-ended balancing approach has far reaching implications and is flawed for reasons that are both theoretical and practical in nature.

We find the reasoning of the Connecticut Supreme Court in *Cologne v Westfarms Associates, supra,* to be sound. The Connecticut Supreme Court rejected a claim that the free speech, assembly, and petition provisions of the Connecticut Constitution protected a right of access to privately owned shopping centers.[46] The court, after reviewing the history surrounding the enactment of the Connecticut Constitution, stated that the concern which led to the adoption of the state constitutional provisions at issue was the protection of individual liberties from governmental interference, not the prevention of private interference with those liberties. In declining to apply a "balancing of interests" approach, the Connecticut Supreme Court stated:

> It is not the role of this court to strike precise balances among the fluctuating interests of com-

---

[46] In *Cologne,* the Connecticut National Organization for Women sought access to the mall to solicit signatures for petitions in support of the Equal Rights Amendment to the federal constitution.

peting private groups which then become rigidified in the granite of constitutional adjudication. That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications which may arise from the exercise of constitutional rights by some in diminution of those of others. [*Id.*, 65.]

## VI

Property rights and economic interests have always been subject to reasonable regulation in promotion of the general welfare. That function, however, has traditionally been performed by the Legislature, which, because of its institutional role and character, is far more competent to deal with such matters. As the Connecticut Supreme Court stated in *Cologne, supra,* 65:

> For the court to assume such a regulatory function . . . would relegate the legislature to a subordinate role in our governmental scheme. Statutes would become largely obsolete if courts in every instance of the assertion of conflicting constitutional rights should presume to carve out in the immutable form of constitutional adjudication the precise configuration needed to reconcile the conflict.

Conflicting evidence was presented in these cases concerning the necessity of a legal right of access to large private malls and the interference with the proprietary interests of the mall owners and their lessees that would result.[47] This is an

[47] The Citizens Lobby makes the factual assertion that the development of private shopping centers has adversely affected the ability of individuals to exercise the rights of free speech, assembly, and petition, because these shopping centers have replaced the traditional public retail districts. Although the Citizens Lobby has not presented any evidence to support this contention, it analogizes these private

shopping centers to the "public markets" of yesteryear, tracing their origin to those of ancient Greece. As the malls note, however, the validity of this factual assertion is questionable. The development of shopping centers has not occurred in a vacuum. While the ability to communicate may have been largely restricted to the public market place many years ago in a less technological era, it is clearly not so inhibited any longer. Today there are radios and television, newspapers, telephones, numerous other public forums and other alternative means of expression. Furthermore, contrary to the assertion of the Citizens Lobby that initiative activity is being stifled by shopping centers that maintain access policies similar to those of Woodland and Equitable Life, the documented recent history in Michigan tends to reflect that citizen-initiated petition drives have gained popularity and success during the same years that witnessed the proliferation of private shopping centers. See n 34.

The malls argue, on the other hand, that mandated political access would impose unreasonable harm on shopping centers. Equitable Life, for example, presented a consumer attitude market survey and expert testimony concerning the adverse effect of compelled access on the shopping center's proprietary and constitutional interests. Woodland asserts that the seriousness of the economic harm would increase as political activity increased in frequency, and that an increase in such activity would also entail an increased risk of violent confrontation. Woodland cites the factual experience that took place in *Cologne, supra,* as illustrative. In *Cologne,* a violent demonstration erupted at the mall involved, when the Ku Klux Klan sought to take advantage of a prior decision of the superior court granting access to the National Organization for Women for expressive purposes. Anti-Klan groups protested and engaged in a heated demonstration which resulted in a major disturbance.

While this evidence is less than conclusive, it tends to show that a legally mandated right of access could present some complex problems and result in some harm to private shopping centers. The Citizens Lobby asserts that the right of access to shopping centers would be subject to *reasonable* time, place, and manner restrictions, and that any potential harm could be minimized by imposing such *reasonable* restrictions. Furthermore, the Citizens Lobby asserts that in situations in which a shopping center is threatened with the risk of a violent confrontation (*e.g.,* counter-demonstrators appearing likely to cause substantial damage), a court of equity could presumably grant relief.

It should be noted that there are no established standards by which to determine the *reasonableness* of time, place, and manner restrictions when access to private property is concerned. Limits exist on the state's power to impose such regulations. See *Heffron v Int'l Society for Krishna Consciousness, Inc,* 452 US 640, 647-648; 101 S Ct 2559; 69 L Ed 2d 298 (1981); *United States v O'Brien,* 391 US 367, 377; 88 S Ct 1673; 20 L Ed 2d 672 (1968). The standards applicable to governmental restrictions of expressive activity on public property, however, is not easily adaptable because of the entirely different nature of the interests involved.

appropriate concern for the Legislature. The Legislature, because of its superior fact-finding ability and general legislative authority, can more adequately deal with these problems concerning the conflicting interests of private individuals. This is the function of that body, and we may not presume that the Legislature has any less concern for these issues than this Court.

We are aware of the extensive development of large shopping malls and the opportunities for individuals and groups to engage in activities such as the gathering of signatures for initiative petitions therein. But, we cannot in judicial conscience reinterpret our state constitution in a way that is contradictory to its fundamental purposes, its history, the intentions of its authors, the past decisions of this Court, and, most importantly, the understanding with which it was adopted by the people of this state.

We affirm the decision of the Court of Appeals in *Woodland v Michigan Citizens Lobby,* and we reverse the decision of the trial court in *Equitable Life Assurance v Michigan Citizens Lobby.*

No costs, a public question being involved.

RYAN, BRICKLEY, and BOYLE, JJ., concurred with RILEY, J.

LEVIN, J. I concur in the result largely because, in the words of the opinion of the Court, "the practical difficulties of obtaining signatures without constitutionally mandated access to the malls has not been shown."

WILLIAMS, C.J.

## I. INTRODUCTION

The Michigan Constitution of 1963, art 2, § 9, reads in pertinent part:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative . . . . To invoke the initiative . . . , petitions signed by a number of registered electors, not less than eight percent . . . of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

This opinion considers the limited issue whether initiative activity authorized by art 2, § 9, of the Michigan Constitution, exercised subject to reasonable time, place, and manner restrictions in the common areas of large, privately owned shopping malls, is a violation of the mall owners' rights of due process, free speech, and association guaranteed by the United States and Michigan Constitutions.

In view of the importance of the people's reservation of the power of initiative and the minimal nature of the intrusion on the rights of the mall owners, we hold that allowing citizens to engage in initiative activity in large, privately owned shopping malls subject to reasonable time, place, and manner restrictions, does not unreasonably restrict the mall owners' rights. The United States Supreme Court has held that such a construction of state law is permissible, and does not infringe on the mall owners' federal constitutional rights. *PruneYard Shopping Center v Robins,* 447 US 74; 100 S Ct 2035; 64 L Ed 2d 741 (1980).

In reaching this conclusion, we emphasize that we are concerned solely with the reservation of the power of initiative under art 2, § 9, and not with the rights asserted by the defendants under other constitutional provisions, notably the freedom of speech and petition guaranteed by Const 1963, art 1, §§ 3 and 5. We therefore express no opinion regarding the necessity for a court to find

"state action" as a prerequisite to granting relief in cases involving alleged interference with the exercise of rights guaranteed under the Declaration of Rights of the Michigan Constitution.[1]

## II. FACTS

### A. *Woodland*

Woodland is the owner and operator of Woodland Mall, located in Kentwood, a suburb of Grand Rapids in Paris Township, Michigan. The mall is enclosed and consists of three major department stores, approximately eighty smaller stores, shops, and restaurants surrounded by a parking area. The mall contains common areas designed to facilitate travel within the mall as well as to promote rest, relaxation, and socialization. The common areas consist of numerous seating facilities, works of art, and fountains.

Woodland Mall maintains a strict policy against permitting activity in the shopping center that is

---

[1] The reservation of the power of initiative is not contained in Michigan's Declaration of Rights, art 1, but in art 2, entitled Elections. As such, it finds no counterpart in the federal Bill of Rights or, for that matter, anywhere in the United States Constitution. Thus, the concept of "state action" as a prerequisite to judicial protection developed in connection with the federal Bill of Rights is not directly applicable here. This conclusion is further supported by the language of art 2, § 9, which states, *The people reserve to themselves the power . . . .* We find this language compelling. The language reserves an affirmative power in the people and does not purport to be a restraint on governmental action. In stark contrast, those provisions of the United States Constitution which have been construed to require state action are couched in prohibitive terms. In fact, the language of many of the provisions, particularly relevant here, explicitly restrains governmental action. For instance, the First Amendment begins, *"Congress shall make no law . . . ,"* and the Fourteenth Amendment provides, *"No State shall . . .* [and]; *nor shall any State deprive . . . ."* This language carries with it an express limitation on governmental action. There is nothing, express or implied, in the language of art 2, § 9, that lends itself to an interpretation that the provision was designed to prohibit governmental action. See *Batchelder v Allied Stores Int'l,* 388 Mass 83, 88; 445 NE2d 590 (1983).

not directly related to the enhancement of commercial retail sales. This policy forbids solicitation, petition, the securing of signatures, speechmaking, the distribution of handbills, and like activity.

The Michigan Citizens Lobby is a nonprofit organization that promotes various consumer interests. On this particular occasion, the Citizens Lobby was attempting to initiate legislation that would forbid automatic utility rate increases and require prior Public Service Commission approval of rate adjustments.

On April 1, 1982, the director of the Citizens Lobby notified Woodland that the Citizens Lobby was interested in collecting signatures at the mall on April 3, 1982. The mall informed him of its policy against such activity, but on April 3 the director and other members of the Citizens Lobby appeared at the mall. They were met at the entrance by a security guard who told them that solicitation was not permitted on mall premises. Nevertheless, the Citizens Lobby entered the mall and set up three card tables and signs in the central courtyard. The mall manager then informed them that they were on private property and asked them to leave. They refused, and approximately five Citizens Lobby members remained and gathered signatures from about noon until 6:00 P.M. At that time the Citizens Lobby announced its intention to return on April 9 and 10 for the same purpose.

On April 6, 1982, Woodland filed a verified complaint in the Kent Circuit Court, seeking a temporary restraining order, a preliminary injunction, and a permanent injunction, to prevent the Michigan Citizens Lobby from soliciting shoppers, gathering signatures, or otherwise entering and remaining on the Woodland Mall premises in vio-

lation of mall policy. The trial judge issued an ex parte restraining order on that day. Following a hearing, the court issued a preliminary injunction on April 15, 1982, which was made permanent on April 27, 1982. In relevant part, the order and final judgment read:

> The defendant, Michigan Citizans [*sic*] Lobby, [is] permanently enjoined from at any time soliciting shoppers, gathering signatures, distributing hand-bills or other literature, securing signatures on petitions, making speeches, and engaging in any other expressive activity on any of the property owned by the plaintiff, Woodland, a Michigan co-partnership, including the common areas, court-yards, and corridors of Woodland Mall, a retail shopping center located in the Township of Paris, County of Kent, and State of Michigan.

The Michigan Citizens Lobby appealed, and, in a two-to-one decision, the Court of Appeals affirmed the trial court's order. 128 Mich App 649; 341 NW2d 174 (1983).

B. *Equitable Life*

Equitable Life is the owner of the Genesee Valley Center, located in Flint Township, Michigan. The center is an enclosed mall consisting of three major department stores and approximately ninety-two smaller stores, shops, and restaurants. Like Woodland Mall, the Genesee Valley Center has common areas which are designed to facilitate travel within the complex as well as to promote rest, relaxation, and socialization. The area is aesthetically pleasing so as to encourage such activity. Equitable Life maintains a strict policy permitting only limited noncommercial activity on its premises. Probably the most severe limitation is that Equitable Life permits such activity for no

more than one consecutive two-hour period per day on two consecutive days, twice a year.[2]

On February 17, 1982, the Michigan Citizens Lobby contacted the Genesee Valley Center and informed the personnel there that it desired to solicit signatures in the center for a petition initiating the legislation described above. The Michigan Citizens Lobby was told that the center permitted such activity, but only in accordance with its written policy.

On February 18, 1982, the Lobby informed the center that it believed such restrictions violated Michigan law and that the organization would not comply with them. Later the center learned that the organization intended to circulate petitions in the mall on February 20, 1982, and that local authorities would not intercede. The center contacted the Citizens Lobby and agreed to permit them to gather signatures on February 20, 1982, on a one-time-only basis, subject to less severe restrictions than those ordinarily imposed under the center's policy.

On February 20, 1982, the Citizens Lobby conducted its initiative activity on the center premises for a six-hour period without incident and gath-

---

[2] The trial judge summed up the major limitations as follows:

"Plaintiff would only permit defendant to solicit in accordance with plaintiff's established policy regulating noncommercial and political activities. That policy, which plaintiffs assert is uniformly enforced, includes the following: each organization must register five working days in advance of the day which they wish to solicit petition signatures including a detailed description of the proposed activity; the noncommercial activity must be conducted from a booth in a prescribed area of the mall and all activities must be carried on within two feet within any direction of the booth; no more than two representatives may be present at any given time; and the organization is *limited to conducting its activities two hours per day on consecutive days, twice per year.* A $100.00 security deposit to cover possible cleanup must be posted. (Emphasis added.)"

The trial judge did not find whether these limitations constituted reasonable time, place, and manner restrictions.

ered approximately 1,300 signatures. When it became clear that the Citizens Lobby intended to pursue this activity on future dates at the center, the center sought relief in the courts.

On February 24, 1982, Equitable Life Assurance Society and others filed a complaint, seeking a declaratory judgment and preliminary and permanent injunctions to prevent the Michigan Citizens Lobby and others from entering onto Equitable Life's properties for the purpose of engaging in noncommercial activity of any nature or, in the alternative, to declare that Equitable Life's policy permitting limited noncommercial activity constituted reasonable time, place, and manner restrictions with which the Michigan Citizens Lobby must comply.[3] On the same date, Equitable Life also filed a motion for an ex parte temporary restraining order enjoining any noncommercial activities by the Michigan Citizens Lobby on Equi-

[3] Factually, the confrontation here centers on Equitable Life's Genesee Valley Center. Apparently, equitable Life also owns four other major shopping facilities in Michigan, Eastland Center in Harper Woods, Westland Shopping Center in Westland, Northland Center in Southfield, and Southfield Shopping Center in Taylor. Equitable Life sought relief from the Michigan Citizens Lobby's activities with respect to its "properties" and the Michigan Citizens Lobby sought affirmative relief in its counterclaim with respect to all five shopping centers, specifically naming each.

From the record, it appears that there was ongoing litigation involving at least one of these other Equitable Life properties, between the same parties, in Wayne County. Both parties expressed a desire for the Genesee circuit judge to assume sole and total jurisdiction with respect to all five of Equitable Life's properties. It seems that the Wayne circuit judge and the trial judge here were amenable to such an arrangement. The record does not reflect any further action in this regard, except that the Genesee circuit judge's order and opinion address all five of Equitable Life's properties. The parties seemed to have conceded that while reasonable time, place, and manner restrictions may vary from one shopping center to the other, if the Michigan Citizens Lobby has the right to enter onto the Genesee Valley Center for initiative activity, it also has the right to enter onto Equitable Life's other centers for the same purpose. In this light, since we do not decide the reasonable time, place, and manner limitation, we need only focus our discussion on the Genesee Valley Center.

table Life's properties.[4] The trial judge did not grant the motion, but instead scheduled a hearing for February 26, 1982, on the propriety of issuing a temporary restraining order. Following the hearing, the trial judge issued a temporary restraining order in favor of the Citizens Lobby.

On March 3, 1982, the Michigan Citizens Lobby answered Equitable Life's complaint and filed a counterclaim for declaratory relief and a preliminary and permanent injunction barring Equitable Life from interfering with its rights of petition, assembly, expression, press, and the initiation of legislation in the general public areas, including interior mall areas, of all shopping centers owned or managed by Equitable Life in Michigan, subject to reasonable time, place, and manner restrictions. Both sides moved for summary judgment. The Michigan Citizens Lobby also requested permanent injunctive relief. After an evidentiary hearing on April 8, 1982, the trial judge rendered an opinion on March 14, 1983, concluding that

> under the Michigan Constitution, a right of access in the mall area of a large private shopping center can exist for the purpose of soliciting signatures on an initiative proposal where the activity comports with the public nature of the property and does not unreasonably impair the value or use of the property as a shopping center.

The trial judge stated that this determination

---

[4] On February 24, 1982, Equitable Life also filed an action against the Flint Township Police Department, the Genesee County Sheriff's Department, and the Genesee County Prosecuting Attorney, seeking a writ of mandamus compelling the enforcement of Michigan's trespass statute, MCL 750.552; MSA 28.820(1), against any persons coming onto Equitable Life's Genesee Valley Center property for the purpose of petitioning or engaging in other noncommercial activity in violation of the center's policy. Apparently, the trial judge consolidated this action with Equitable Life's action against the Michigan Citizens Lobby.

must be made on a case-by-case basis and that an evidentiary hearing would be conducted to determine the public nature of Equitable Life's shopping malls and the detrimental effect that the Citizens Lobby's activities would have on Equitable Life's interests. On May 16, 1983, the trial judge issued an order in accordance with his opinion.

The Court of Appeals granted Equitable Life's application for leave to appeal. On February 29, 1984, this Court granted Equitable Life's application for leave to appeal prior to decision by the Court of Appeals, and also granted leave to appeal in the Woodland case. 418 Mich 955.

### III. THE IMPORTANCE OF THE INITIATIVE POWER

The importance of the power of initiative in Michigan's constitutional scheme cannot be overemphasized. In a democracy, governmental power ultimately rests with the people, and art 2, § 9, reflects this principle. As we stated in *Kuhn v Dep't of Treasury,* 384 Mich 378, 385; 183 NW2d 796 (1971):

> [U]nder a system of government based on grants of power from the people, constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed.[10]

---

[10] "In the last analysis, the people are the fountainhead of law in a democracy, and therefore, it is natural that the legislative article should contain a reservation by the people of the right to make laws directly, through use of the statutory initiative and referendum. . . ." Lederle, "The Legislative Article," in Pealy (ed), *The Voter and the Michigan Constitution in 1958* (1958), p 47.

---

The power of initiative removes from the Legislature the exclusive right to make laws and leaves it a coordinate legislative body with the people.

*Advisory Opinion on Constitutionality of 1982 PA
47,* 418 Mich 49, 66; 340 NW2d 817 (1983). The
initiative was in large part a response to the
failure of political parties to enact promised legis-
lation. *Hamilton v Secretary of State,* 227 Mich
111, 130; 198 NW 843 (1924). As a consequence,
"the electorate . . . took matters into its own
hands and constructed a constitutional procedure
by which it could . . . bring about desired legisla-
tion without the aid of the legislature."

The same issue we face today was decided by the
Washington Supreme Court in *Alderwood Associ-
ates v Washington Environmental Council,* 96
Wash 2d 230; 635 P2d 108 (1981). In the concur-
ring opinion of Justice Dolliver, it was stated that
the role created for the people by the initiative
power is "closely akin to that of a fourth branch of
government." *Id.,* 252.

> It should be noted that the initiative process is
> not a "right" against government in the sense of
> [the guarantee of freedom of speech]. Rather,
> amendment 7 [the reservation of the power of
> initiative] is a declaration by the people in their
> constitution that they are part of the legislative
> process. Amendment 7 declares not that the people
> have a right against government but that the
> people are part of the apparatus of government—
> the legislative branch. As a part of government
> the initiative process may be exercised, as may
> other aspects of government, only in such a way as
> not to restrict the use of private property so as to
> amount to a taking. [*Id.,* 251.]

Access to people is the life blood of the initiative
power. The requisite number of signatures cannot
be obtained unless the petition circulators have
access to other citizens in numbers sufficiently
large to secure the constitutional requirement of
eight percent of the total vote last cast for Gover-

nor. Further, unlike cases involving dissemination of political messages in general, with regard to the exercise of the initiative power, there must be *personal* contact with individual voters. There is no other legal method of obtaining the constitutionally required number of signatures. See *Batchelder v Allied Stores Int'l, supra,* 92. In fact, the circulator of the petition is required by statute to certify "that each signature on the petition was signed in his presence . . . ." MCL 168.544c; MSA 6.1544(3). See MCL 168.482; MSA 6.1482.

It is common knowledge that not all initiative drives are successful. To acquire signatures equal to eight percent of the *total* votes cast for Governor is, in fact, quite a formidable task. By comparison, we note that new political parties can place their candidates on the primary ballot by merely obtaining signatures equal to one percent of those who voted for the *successful* candidate for Secretary of State in the preceding election. MCL 168.685; MSA 6.1685. But see MCL 168.560b(4); MSA 6.1560(2)(4). Generally, the number of signatures required for ballot access in other situations is also relatively small.[5]

The major regional malls here provide a unique opportunity for signature gatherers to collect the needed signatures. As counsel for Equitable Life stated in the trial court, "this group of defendants thinks that the shopping center is a good place to collect signatures *which it is . . . .*" (Emphasis

[5] See MCL 168.1 *et seq.;* MSA 6.1001 *et seq.* For example, candidates seeking election to the offices of Governor or United States Senator need only obtain signatures equal to one percent of the votes cast by the candidate's party for Secretary of State in the last November election, as long as the petitions are signed by at least one hundred registered electors in at least twenty counties. MCL 168.53, 168.93; MSA 6.1053, 6.1093. But see Const 1963, art 12, § 2. Even something as important as amending the Michigan Constitution only requires two percent more signatures than an initiative proposal, ten percent of the total vote cast for Governor in the last election.

added.) Approximately 47,000 people visit the Genesee Valley Center every Saturday, and Equitable Life's expert witness testified that eighty-six percent of the residents of the greater Flint area use the Genesee Valley Center frequently. Unlike other locations where large numbers of people gather, visitors to the large malls are encouraged to come for a variety of activities: to shop, have a meal, get a haircut, see a movie, meet friends, and relax in the seating provided in common areas.

Claims of persons exercising the power of initiative to access to such large numbers of people in this setting should not be lightly disregarded.

## IV. THE RIGHTS OF THE MALL OWNERS

The owners of the shopping malls involved in these cases contend that compelling them to permit initiative activity in the malls would be an unconstitutional infringement of their rights under both the Michigan and the federal constitutions.

The mall owners contend that their rights of free speech and association, guaranteed by the First Amendment and by Const 1963, art 1, §§ 3 and 5, protect them against being compelled by the state to be a forum for the beliefs of others. *Wooley v Maynard,* 430 US 705; 97 S Ct 1428; 51 L Ed 2d 752 (1977). We believe that the fact that the malls are open to the public make it unlikely that visitors will associate the petitioners' activity with the views of the mall owners, and the owners are free to post signs disassociating themselves with the initiative being promoted. *PruneYard Shopping Center v Robins, supra,* 87.

The owners point to their right against being deprived of property without just compensation and due process of law. These rights are protected

against infringement by the Fifth and Fourteenth Amendments of the United States Constitution, as well as art 1, § 17, and art 10, § 2, of the Michigan Constitution. The importance of these property rights cannot be questioned. See *Roman Catholic Archbishop of Detroit v Village of Orchard Lake,* 333 Mich 389, 392; 53 NW2d 308 (1952).

One essential element of protected property rights is the right to exclude others, *Kaiser Aetna v United States,* 444 US 164, 179-180; 100 S Ct 383; 62 L Ed 2d 332 (1979), and it is on this aspect of their property rights that the mall owners base their claim.

Historically, property rights have not been without limits. They have, for example, been held subject to the state's police power. *Patchak v Lansing Twp,* 361 Mich 489, 498; 105 NW2d 406 (1960). Further, the voluntary opening of the mall property to use by the general public diminishes, although it does not extinguish, the owner's right to exclude.

In *PruneYard,* the United States Supreme Court focused on the obvious and most significant property right of the mall owners as follows:

> Here the California Supreme Court decided that Art 1, §§ 2 and 3, of the California Constitution gave appellees the right to solicit signatures on appellants' property in exercising their state rights of free expression and petition. In so doing, the California Supreme Court *rejected appellants' claim that recognition of such a right violated appellants' "right to exclude others," which is a fundamental component of their federally protected property rights.* [Emphasis added. *PruneYard, supra,* pp 79-80.]

In sum, we find that the intrusion on the rights of the shopping center owners by the activities of

persons seeking signatures on initiative petitions is minimal. In the California Supreme Court's opinion in the *PruneYard* case, *Robins v Prune-Yard Shopping Center,* 23 Cal 3d 899, 911; 153 Cal Rptr 854; 592 P2d 341 (1979), the Court concluded:

"A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendants to assure that these activities do not interfere with normal business operations . . . would not markedly dilute defendant's property rights." [Citations omitted.]

In view of our holding that the owners may adopt reasonable restrictions as to time, place, and manner, the owners are assured that orderly initiative activity will have little or no negative effect on the use of the property for the commercial purpose to which it is dedicated.[6] As Justice Dolliver in his concurring opinion in *Alderwood, supra,* p 253, stated:

Given the importance of the initiative procedure, I do not feel that plaintiff's property rights were unreasonably restricted. The property remains in the possession of its owners. The State does not appropriate it or demand exclusive use of it. The people merely desire access to gather signatures on an initiative petition, an integral part of the state's political process. Implicit in the initia-

[6] The mall owners point to a statistical survey they had commissioned, purporting to show that shoppers would be less likely to patronize the malls if individuals are allowed to conduct initiative activity in the common areas. In our opinion, this self-serving survey fails to establish a significant impairment of the commercial value of the malls. The cited statistics are merely speculative and do not show any actual loss of business. They demonstrate, in fact, that most shoppers favor, or are indifferent to, initiative activities at large shopping centers. In any event, consumer attitudes might be more favorable if shoppers were aware that the activity was protected by the Michigan Constitution in these and competitive malls.

tive process is the need to gather signatures in a manner which does not violate or unreasonably restrict the rights of private property owners.

## V. CONCLUSION

We hold that Const 1963, art 2, § 9, authorizes initiative activity in the common areas of large, privately owned shopping malls, subject to reasonable time, place, and manner restrictions, and that the minimal intrusion on the rights of the mall owners is justified in view of the importance of the power of initiative reserved by the people.

In *Woodland,* the mall had a strict policy of complete exclusion of the activity pursued by the Michigan Citizens Lobby. This policy is clearly violative of Const 1963, art 2, § 9. Therefore, we would reverse the judgment of the Court of Appeals, vacate the permanent injunction entered by the trial court, and remand the case to the trial court for proceedings not inconsistent with this opinion.

In *Equitable Life Assurance,* the mall permitted activities such as those sought to be engaged in here, but only on a very limited and restricted basis. The trial court issued an opinion, order, and partial declaratory judgment in favor of the Michigan Citizens Lobby. The trial judge, however, made no finding as to whether Equitable Life's policy constituted reasonable time, place, and manner restrictions. Therefore, we would affirm the ruling of the trial court insofar as it is consistent with this opinion, but remand for a determination whether Equitable Life's policy regarding initiative activity in the mall constitutes reasonable time, place, and manner restrictions.

CAVANAGH, J., concurred with WILLIAMS, C.J.